**UNITED STATES DISCTICT COURT**
**DISTRICT OF NEW JERSEY**
_____x

| | |
|---|---|
| **ALEX G. LEONE,** : | **COMPLAINT** |
| Plaintiff, : | **JURY TRIAL DEMAND** |
| v. : | |
| : | |
| **ESSEX COUNTY PROSECUTOR'S OFFICE,** : | |
| **THEODORE STEPHENS II,** : | |
| **ROMESH SUKHDEO,** : | |
| **GWENDOLYN WILLIAMS,** : | |
| **and** : | |
| **ROGER IMHOF,** : | |
| **in their individual and official capacities,** : | |
| Defendants. : | |

_____x

Alex G. Leone ("Plaintiff"), by way of this Complaint against the Essex County Prosecutor's Office, Theodore Stephens II, Romesh Sukhdeo, Gwendolyn Williams, and Roger Imhof (collectively, "Defendants"), whose address is 50 West Market Street, Newark, New Jersey, says:

**Jurisdiction and Venue**

1. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action arises under the First Amendment and 42 U.S.C. § 1983. The Court has supplemental jurisdiction over Plaintiff's state-law claim pursuant to 28 U.S.C. § 1367(a) because it forms part of the same case or controversy. *See also* N.J.S.A. 10:5-13(a)(2).

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this is the district in which a defendant resides and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

1

**Parties**

3. Defendant Essex County Prosecutor's Office ("the ECPO") is an agency of a political subdivision of the State of New Jersey and employs Plaintiff.

4. Defendant Theodore Stephens II is "Acting Essex County Prosecutor;" Romesh Sukhdeo is "Acting First Assistant Prosecutor;" Gwendolyn Williams is "Executive Assistant Prosecutor;" and Roger Imhof is "Chief Assistant Prosecutor." Each is a high-ranking supervisory official at the ECPO, and each either participated directly in or ratified the legal violations described herein.

5. As a political subdivision of a State, or its agency, and its officials, Defendants are state actors subject to suit under 42 U.S.C. § 1983. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 528, 547 (1993).

6. Defendants are an "employer" governed by the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.* ("the NJLAD"). *See* N.J.S.A. 10:5-5(a) & (e).

7. Plaintiff is a "Special Deputy Attorney General" or "Assistant Prosecutor" who has been an employee of Defendants since 2019. *See* N.J.S.A. 10:5-5(f).

**Background**

8. On April 26, 2021, Plaintiff submitted a request for religious accommodation to Defendants. Ex. A ("the Request for Accommodation" or "the request").

9. Plaintiff used Defendants' form. The form provides a prompt for the "accommodations description and reason therefore." In response to that prompt, in the space provided on the form, Plaintiff handwrote the following:

> Work and pray throughout the day at home, to be physically present at office or court when reasonably necessary or when accommodating this religious need would cause undue hardship.

> Reason:  I have a spiritual need to pray in peace and solitude, such as in my backyard, several times throughout the day.  [Exs. A & B.][1]

10. In other words, to avoid foregoing a sincerely-held religious practice, Plaintiff requested to work and pray from home when doing so would *not* "cause undue hardship" for Defendants.  Exs. A & B.

11. In response to the Request for Accommodation, Defendants scheduled a May 6, 2021 "Teams" meeting to discuss the request.  ("Teams" is a software that efficiently enables live audiovisual meetings, with the ability to share screens or documents.)

12. At the meeting, Plaintiff further explained the request, provided additional information, and answered all questions of all parties in attendance, including Defendant Imhof and Defendant Williams.

13. On request, Plaintiff provided a summary shortly after the meeting, which stated:

> - I am requesting an accommodation of modifying the schedule.
> - Currently, the schedule permits me, during every other week, to work from home primarily and be physically present at the office or court when reasonably necessary (several examples were discussed).
> - I am requesting that this status quo continue and be extended from every other week to each week.
>
> The reasons for this request were also covered extensively, but to reiterate:
>
> - I have a spiritual need to pray in peace and solitude, such as in my backyard, several times throughout the day.
> - Being physically present in the office interferes with this necessary religious practice:  For instance, it makes me feel uncomfortable and unable to concentrate, prevents

---

[1] Exhibit B is the relevant text from Exhibit A in typed form.  Plaintiff's personal cell phone number and home address have been redacted from Exhibit A.  Defendant Imhof's cell phone number has been redacted from Exhibit G.  Plaintiff respectfully requests that Defendants not publicly disclose Plaintiff's cell phone number or home address; and that if Defendants intend to do so, they provide notice so that Plaintiff may move for a protective order under Fed. R. Civ. P. 26(c).

> spontaneous spoken prayer, is antithetical to that peace and solitude, and permits other people to see or hear me.
> - For the above reasons, potential alternatives that were considered—such as commuting to a public park or driving back and forth between my home multiple times throughout the day—are unworkable.

Please let me know if you need any additional information. [Ex. C]

14. That summary accurately reflects the following facts about Defendants' work schedules and Plaintiff's religious practice:

**Defendants' Work Schedules**

15. Over the past year, primarily as a result of the pandemic, Defendants have permitted all or mostly all employees to work from home on various schedules and, when working from home, to be physically present at their offices or court when reasonably necessary.

16. A schedule utilized by Defendants is called "A/B," in which one group of people (e.g., the "A" group) works from home during one week while the other group of people works from the office during that week, with the two groups switching places of work (home or office) after each week. This is the schedule to which Plaintiff is currently subject in his ECPO office section ("Financial Crimes and Intellectual Property") and has been subject for most of this year (2021).

17. But during other periods, or for other employees, other schedules applied: For instance, during December 2020 through January 2021, Plaintiff was permitted to work from home each week and required to be physically present at the office or court only when reasonably necessary. **And from approximately November and into the present month (June 2021），** *at least one entire section of the office ("Adult Trial") was permitted to work from home every day, i.e., each week*.

4

18. Defendants thus provide individualized exemptions that permit some employees to work from home on some days, or for some reasons, but not others—the opposite of "uniform application of terms and conditions of attendance." *See* N.J.S.A(q)(3)(d)(ii).

### Plaintiff's Religious Practice

19. Plaintiff is a Christian for whom prayer, including spontaneous spoken prayer, is both required by his religion and essential to all aspects of his life.

20. This religious practice includes covering certain topics in prayer each day—e.g., gratitude to the Creator for specific blessings, forgiveness, and prayers for the various needs and wellbeing of others—throughout the day, praying about other issues that arise in daily life, and reading Bible verses out loud.

21. This religious practice requires peace and solitude throughout the day:  For Plaintiff, for instance, praying requires spontaneously and audibly speaking prayers not heard by others; deep concentration that is only possible in peace and solitude; and perceiving and contemplating the handiwork of the Creator, such as by looking up at the sky.[2] These reasons are naturally interconnected (e.g., Plaintiff cannot concentrate on his spoken prayers when others could hear).

22. When not required to be in the office physically, Plaintiff prays in peace and solitude several times throughout the day, including spontaneously, in his backyard (e.g., on breaks), and when looking at the sky.  Plaintiff has done so for more than a year and his dedication to his religious life is stronger than ever.  This practice is sincerely held.

23. This practice has never interfered in Plaintiff's work, work efficiency, or responsiveness to work communications.  In fact, it greatly assists Plaintiff in his work.

---

[2] There are scriptural bases for Plaintiff's prayer practice; if relevant, citations to scripture can be provided.

5

24. When required to be in the office physically, Plaintiff's prayer practice must be foregone: For instance, in an office in which others are in close proximity or could interrupt—e.g., Plaintiff often hears his colleague distinctly through his office wall—peace and solitude and the resulting concentration are impossible, as is the ability to pray spontaneously and audibly without being heard by others.

25. When Plaintiff's prayer practice must be foregone, he suffers psychologically (e.g., by experiencing anxiety or dread during time in the office as well as during nights before going to the office); professionally (e.g., in being unable focus on and complete work efficiently); and even physically (e.g., in suffering sleep problems or headaches).

26. Foregoing Plaintiff's prayer practice is sometimes an unavoidable consequence of life.

27. But here, to the extent Defendants would require, it is not.

### The NJLAD[3]

28. The NJLAD prohibits "impos[ing] upon a person as a condition of . . . retaining employment . . . any terms or conditions that would require a person to violate or forego a sincerely held religious practice or religious observance . . . unless, *after engaging in a bona fide effort*, the employer *demonstrates* that it is unable to reasonably accommodate the employee's religious observance or practice *without undue hardship* on the conduct of the employer's business." N.J.S.A. 10:5-12(q)(1) (emphases added).

29. In other words, an employer cannot "require a person to violate or forego a sincerely held religious practice" unless it *both* "engag[es] in a bona fide effort" *and* "demonstrates . . . undue hardship." N.J.S.A. 10:5-12(q)(1).

---

[3] Because Plaintiff's free exercise claim arose in the process of seeking an accommodation under the NJLAD—and because Defendants attempt to defend their infringement of Plaintiff's free exercise by relying on the NJLAD, *see, e.g.*, Ex. D at 2-3; Ex. G—background regarding the NJLAD is provided first.

30. "Undue hardship" means "an accommodation requiring *unreasonable expense or difficulty*, *unreasonable interference with the safe or efficient operation of the workplace* or a violation of a bona fide seniority system or . . . any provision of a bona fide collective bargaining agreement." N.J.S.A. 10:5-12(q)(3)(a) (emphasis added).

31. Partly because of its rigorous definition of "undue hardship," and the heightened burden it places on employers, the NJLAD provides "people of faith rights that *exceed[] those afforded*" under Title VII. *Victor v. State*, 203 N.J. 383, 407 (2010) (emphasis added).

32. And the NJLAD must be "liberally construed" to protect these rights. N.J.S.A. 10:5-3.

33. As explained herein, Defendants have failed to fulfill both statutory obligations: to demonstrate undue hardship and to engage in a bona fide effort.

34. But even just one of these failures violates the NJLAD and necessitates judicial intervention. *See* N.J.S.A. 10:5-12(q)(1); N.J.S.A. 10:5-13(a)(2); N.J.S.A. 10:5-3.

### Defendants' Violations of the NJLAD
### Failure to Demonstrate Undue Hardship

35. After Plaintiff sent the summary on May 6, *see* Ex. C; *supra*, ¶ 13, Defendants proceeded to deny the Request for Accommodation categorically—that is, without granting even a small part of what was requested—requiring Plaintiff to forego his sincerely-held religious practice as a condition of retaining employment. Defendants did so in a memorandum forwarded by Defendant Imhof on May 12, 2021, on which all named Defendants were cc'd. Ex. D ("the Memorandum").

36. The Memorandum's entire analysis consists of one paragraph of assertions; and the Memorandum does not even attempt to connect those assertions to Plaintiff's job responsibilities or the particular facts of Plaintiff's employment. *See* Ex. D at 2-3.

37. In other words, the Memorandum flatly fails to provide individualized consideration to the Request for Accommodation. The Memorandum, moreover, fails to cite even a single concrete fact or specific example in support of its categorical denial.

38. For instance, as a putative reason to deny the request, the Memorandum vaguely asserts that work "meetings are not pre-scheduled and occur on an ad hoc basis," but fails to explain with any fact or example why permitting Plaintiff to participate in such meetings electronically would "requir[e] unreasonable expense or difficulty [or] unreasonable interference with the safe or efficient operation of the workplace," *see* N.J.S.A. 10:5-12(q)(3)(a), and fails to mention that such meetings are rare, Ex. D at 2.

39. (As the past year has made clear, an electronic meeting—whether by simply calling or clicking on a "Teams" icon—does not require "unreasonable expense or difficulty" or "unreasonable interference" with efficiency: It is efficient or even seamless; and, in fact, it was **Defendants' chosen method of meeting** on May 6 to discuss the request, and has been **Plaintiff's supervisor's chosen method of meeting** during weeks Plaintiff is working from home or even when working in the office.)

40. Or, for instance, the Memorandum vaguely asserts that "emergent matters that arise may require immediate response that would necessitate . . . presence in the office," but cites no fact or example of such a scenario—**it is not clear whether such a scenario has ever occurred**—and fails to explain why in such a scenario Plaintiff could not simply drive to the office immediately. *See* Ex. D at 2; *infra*, ¶ 65.

41. Or, for instance, the Memorandum vaguely appeals to "collaborat[ion]" and asserts that "work . . . often requires in person discussion" without any explanation of why "in

person" discussion is "require[d]"—either required at all or required so unconditionally that the request could not be granted even in part.  *See* Ex. D at 3.

42. If the statutory duty to *demonstrate undue hardship* means anything, *see* N.J.S.A. 10:5-12(q)(1), it means that Defendants cannot discharge that duty with vague assertions: without citing a single concrete fact or specific example, without any individualized analysis, and without any explanation of the "requirement" of physical presence, which Defendants incoherently claim obtains *at all times*.

43. Defendants' assertions belie the facts of the past year and present status quo.

44. **In addition, the Memorandum triply guts its own professed rationale:**

45. *First*, it acknowledges that *only in certain circumstances*, and not always, are employees "required to be in the office during their 'at home' week *based on the needs of the office*." Ex. D at 1 (emphasis added).

46. If this admission does not entirely refute Defendants' professed rationale for denying the request categorically, it directly contradicts it.  There are two more that do the same:

47. *Second*, the Memorandum permits Plaintiff to be out of the office and range "a four hundred (400) acre property . . . so long as it does not adversely impact [his] work responsibilities." Ex. D at 3.  Defendants have refused to explain why **commuting to and ranging a 400-acre property outside the office** does not impose an undue hardship—but working from home does, allegedly *always* does.  *See infra*, ¶¶ 56-58.

48. *Third*, the Memorandum acknowledges that Defendants have already widely provided the accommodation Plaintiff seeks:  They permitted all or almost all employees to work from home at least half the time—currently and for the past year.  *See* Ex. D at 1.

49. *And* Defendants already permitted other employees to work from home *fulltime for half a year—even while categorically denying the Request for Accommodation. See* ¶ 17.

50. These admissions plainly show that Defendants do not always suffer unreasonable expense or difficulty—or unreasonable interference with the safe or efficient operation of the workplace—*whenever a single employee* works from outside of the office.

51. In other words, these admissions show that Defendants' categorical denial of the Request for Accommodation, with no individualized consideration, cannot withstand legal scrutiny under the NJLAD's requirement that they "*demonstrate* . . . undue hardship." *See* N.J.S.A. 10:5-12(q)(1) (emphasis added).

### Failure to Engage in Bona Fide Effort

52. In addition, the Memorandum and Defendants' subsequent conduct show that they have failed to "engag[e] in a bona fide effort . . . to reasonably accommodate [Plaintiff's] religious observance or practice." *See* N.J.S.A. 10:5-12(q)(1).

53. *First*, the Memorandum categorically denies the Request for Accommodation, permitting not even days—or even hours or minutes—of work from home to accommodate prayer: Defendants made no effort to determine when the Request for Accommodation would cause undue hardship and when it would not: They simply asserted, categorically, that it always does. This position cannot satisfy even the most lenient level of legal scrutiny—let alone the NJLAD's heightened requirements. ¶ 31.

54. The past year and present status quo—by Defendants' own admissions, *see supra*, ¶¶ 44-51—clearly show both the practicability and efficiency of granting the request. And again, by its own terms, the Request for Accommodation requests that Plaintiff work and pray from home *only when doing so would* not *cause undue hardship for*

*Defendants*.  Exs. A & B.  The Memorandum completely omits this crucial component of the request.  *See* Ex. D.  And when informed of this conspicuous omission, Defendants refused to address it and refused to engage in any effort to accommodate—not even by one day, hour, or minute.  *See* Ex. E at 3; Ex. F.

55. ***Second***, the Memorandum's foremost "offer" of an "accommodation" is permitting Plaintiff to "engage in pray in [his] private office during the work day."  Ex. D at 3. But this "accommodation" is simply the status quo that gave rise to the need for the Request for Accommodation to begin with; let alone that it is plainly legally required.

56. The Memorandum's other two "accommodations" would either:

    a. require Plaintiff—multiple times every day, regardless of the weather—to cross a busy street twice, hike up and down wooded hills and muddy terrain in work attire, and search for potentially secluded areas spread across 400 acres; or

    b. be confined to a repurposed soundproof room fitted with surveillance cameras and no windows.  Ex. D at 3.

57. For obvious reasons, which can be further explained, none of these "accommodations" promotes work efficiency and all of them would require Plaintiff to forego prayer as required by his religion.  Defendants even recognize that they know it—that their proposed "accommodations" "would curtail the spontaneous nature of [Plaintiff's] prayer and . . . subject [Plaintiff] to being seen and heard by others."  Ex. D at 1.

58. These proposed "accommodations" defy not only law but logic:  for instance, by *always* permitting Plaintiff to be out of the office to range "a four hundred (400) acre property . . . so long as it does not adversely impact [his] work responsibilities," Ex. D at 3, but *never* permitting Plaintiff to be out of the office to work at home on the very same

       condition. Defendants have refused to explain this obvious contradiction, among others. *See supra*, ¶¶ 43-48; Ex. F; Ex. G.

59. And even if the proposed accommodations were not illogical, Defendants could not impose them and require Plaintiff to forego prayer as required by his religion "*unless*" Defendants first "demonstrate[d] . . . undue hardship" as defined by statute, which they have failed to do. *See* N.J.S.A. 10:5-12(q)(1) (emphasis added); *supra*, ¶¶ 35-51.

60. ***Third***, Defendants' summary rejection of Plaintiff's thorough and carefully-researched response to the Memorandum, Ex. E, shows they have not engaged in a bona fide effort. As detailed below, Defendants replied to Plaintiff's ten-page response with a boilerplate nonresponse—*and then refused to answer basic questions about the process for considering the requested accommodation*. *See* Ex. F.

### Plaintiff's Response to the Memorandum (Ex. E)

61. On June 1, 2021, Plaintiff responded to the Memorandum raising many of the points expressed in the foregoing paragraphs. Among the points are:

62. The statutory factors used to assess undue hardship clearly cut against denying the Request for Accommodation, *see* N.J.S.A. 10:5-12(q)(3)(b); and upon scrutiny, the reasons offered for denying it plainly do not justify a denial:

    a. The Memorandum presents two observations—about in-person court appearances and witness interviews—that are fully consistent with the Request for Accommodation, as the past year and present status quo have made clear: Plaintiff has been and would continue to be physically present for all in-person court appearances and witness interviews; *and the Request for Accommodation expressly*

*recognizes his willingness to be physically present, not only under those circumstances, but* whenever *working remotely "would cause undue hardship."*

b. The Memorandum utterly fails to explain why permitting Plaintiff to participate in potential meetings telephonically (or through Teams, etc.) in order to accommodate Plaintiff's need to pray would impose an undue hardship, an "unreasonable interference with the safe or efficient operation of the workplace:" It is not clear whether permitting Plaintiff to participate in meetings electronically would impose *even a de minimis burden* on Defendants.

c. The Memorandum makes a vague assertion about nondescript "emergent matters," *see infra*, ¶ 65, provides no specific example or concrete fact in support of any assertion, and fails to provide any individualized analysis.

d. The Memorandum categorically refuses to grant the requested accommodation—not even subject to potential future tailoring—based on extremely rare hypothetical scenarios and speculation; and the Memorandum conspicuously ignores the fact that any accommodation granted could be tailored if necessary in the future.

63. Because they had no substantive response, *see* Ex. F, whether Defendants have even considered any of these weaknesses in their denial is unclear. But what is clear: Their barebones reply shows anything but effort—let alone bona fide effort.

64. In addition, when Plaintiff asked Defendants, "[W]hat is the process for appealing this denial?" Defendants refused to provide a response to that question. Ex. G.

65. Defendants also refused to clarify who participated in denying the request: for instance, Plaintiff's supervisor, who could have informed Defendants that **there has never been an "emergent matter[] that . . . immediate[ly] . . . necessitate[d] [Plaintiff's]**

13

**presence in the office,"** *see* Ex. D at 2, or that **during weeks Plaintiff was working from home,** *all* **court appearances and in-person witness interviews proceeded normally and efficiently**, *see* Ex. D at 2; Ex. E at 4.

66. Categorically asserting, with no factual analysis, that the request always imposes undue hardship; "offering" only the status quo or "accommodations" that admittedly have the same problems; and refusing to dialogue and answer basic questions about the process for considering the requested accommodation cannot be the "bona fide effort" required by statute. *See* N.J.S.A. 10:5-12(q)(1).

67. For these reasons, Defendants have failed to fulfill both applicable statutory obligations: Defendants have failed to demonstrate undue hardship and have failed to engage in a bona fide effort to reasonably accommodate Plaintiff's religious practice.

### The First Amendment

68. Defendants' failures under the NJLAD presage their violation of the First Amendment.

69. The First Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." (The Free Exercise Clause governs not only Congress, but States and their political subdivisions and agencies as well. *See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).)

70. Requiring an employee to forego a sincerely-held religious practice as a condition of retaining employment infringes his right to free exercise within the meaning of the First Amendment. *See, e.g.*, *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988) ("[T]his Court has repeatedly held that indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the

First Amendment."); *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 140 (1987) (recognizing the unlawfulness of forcing an employee "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand" (quoting *Sherbert v. Verner*, 374 U.S. 398 (1963))) (citing *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707 (1981)).

71. Incidental infringement of free exercise could be legally permissible under *Employment Division v. Smith*, but *Smith*'s rule, by its own terms, applies when an infringement of free exercise is the result of a "valid and neutral law of general applicability" or "an across-the-board . . . prohibition." *See* 494 U.S. 872, 879, 884 (1990); *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. ___, ___ (slip op.) at 5 (June 17, 2021).

72. A rule can fail to be "generally applicable" in numerous ways. For example:

    a. If it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," *Fulton*, (slip op.) at 6;

    b. If a state actor "permit[s] secular exemptions [to the rule] but not religious ones," or uses "a system of individualized exemptions," *see, e.g.*, *Ward v. Polite*, 667 F.3d 727, 739, 740 (6th Cir. 2012); *Fulton*, (slip op.) at 5-6; or

    c. "[W]henever [the rule] treat[s] *any* comparable secular activity more favorably than religious exercise," *Tandon v Newsom*, 141 S. Ct. 1294, 1296 (2021) (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67-68 (2020) (per curiam)).

73. And when *Smith*'s requirement of general applicability is not met, *strict scrutiny applies*. *Fulton*, (slip op.) at 13; *Tandon*, 141 S. Ct. at 1296.

74. Defendants fail to comply with the mandates of neutrality and general applicability.

### Defendants' Violation of the First Amendment

75. So Defendants trigger strict scrutiny for at least the three reasons outlined above:

    a. Defendants have "prohibit[ed] religious conduct," i.e., working from home as necessary to pray, "while permitting secular conduct," i.e., working from home for secular reasons, which "undermines the government's asserted interests in a similar way"—in fact, the same exact way, *see Fulton*, (slip op.) at 6; Ex. E at 1-2;

    b. Defendants "permit secular exemptions," e.g., medical-based exemptions, "but not religious ones;" and Defendants use "a system of individualized exemptions" that permits some employees to work from home (e.g., *dozens of employees* in "Adult Trial") at some times (e.g., *fulltime from November into the present month*) but not others, and for some reasons (e.g., secular reasons related to the pandemic, or employees' other reasons) but not others, *see, e.g.*, *Ward*, 667 F.3d 739-40; *Fulton*, (slip op.) at 5-6; *supra*, ¶¶ 15-18; *and*

    c. **Defendants treat the activity of working from home for secular reasons more favorably** *than the same exact activity undertaken for religious reasons*, **which they have chosen to prohibit categorically**, *see Tandon*, 141 S. Ct. at 1296*; supra*, ¶¶ 35 & 54-55; Ex. D at 2.

76. Accordingly, strict scrutiny applies. *See, e.g.*, *Tandon*, 141 S. Ct. at 1296.

77. To survive strict scrutiny, a defendant must demonstrate that its infringement of free exercise furthers "interests of the highest order" *and* is "narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye*, 508 U.S. at 546.

78. Defendants do not even come close to meeting their burden under any form of heightened scrutiny, *see supra* ¶¶ 31 & 53, let alone strict scrutiny:

16

    a. Defendants assert only vague interests not backed by any concrete fact or specific example, *see* Ex. D at 2-3; Exs. F & G; *see, e.g.*, *Fulton*, (slip op.) at 13-14 ("The City states these objectives at a high level of generality, but the First Amendment demands a more precise analysis."); and provided no individualized analysis, *see, e.g.*, *Fulton* (slip op.) at 14 ("The question . . . is not whether the City has a compelling interest in enforcing its . . . policies generally, but whether it has such an interest in denying an exception to [*Plaintiff*]"); *and*

    b. Defendants have *categorically* prohibited Plaintiff's free exercise of his prayer practice—the exact opposite of narrow tailoring, *see, e.g.*, *supra*, ¶¶ 53-54 (Defendants have refused to permit even "one day, hour, or minute" of work from home as necessary to accommodate prayer); Ex. D at 2-3; *see generally* Ex. E.

79. Defendants also refused to provide any additional reasons or explanation. Exs. F & G.

80. **And *by extending the very same accommodation requested by Plaintiff to dozens if not hundreds of other employees***, *see supra*, ¶¶ 17, 48 & 74, Defendant Essex County Prosecutor's Office "itself has demonstrated that it has at its disposal an approach" that would accommodate Plaintiff's sincerely-held religious practice without undue hardship. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 730 (2014).

81. Defendants even considered and denied the Request for Accommodation—during April 26, 2021, to May 21, 2021—*during the very time they were already granting the same accommodation to other employees for secular reasons*, **proving they have at their disposal just such an approach**. *Hobby Lobby*, 573 U.S. at 730; Exs. A & D.

82. Defendants cannot rely on a medical rationale to defend their totally untailored religious discrimination. *See, e.g.*, *Fraternal Ord. of Police Newark Lodge No. 12 v.*

*City of Newark*, 170 F.3d 359, 367 (3d Cir. 1999) (Alito, J.) (recognizing the unlawfulness of "a value judgment that secular (i.e., medical) motivations . . . are important enough to overcome [an employer's] general interest . . . but that religious motivations are not"); *id.* ("We are at a loss to understand why religious exemptions threaten important city interests but medical exemptions do not.").

## FIRST CLAIM:
## VIOLATION OF THE RIGHT TO FREE EXERCISE (42 U.S.C. § 1983)

83. Plaintiff repeats and realleges each of the allegations of this Complaint.

84. By requiring Plaintiff to forego his sincerely-held religious practice as a condition of retaining employment, *see, e.g.*, *supra*, ¶¶ 24, 35 & 53, Defendants have infringed Plaintiff's free exercise. *See, e.g.*, *Lyng*, 485 U.S. at 450; *Hobbie v*, 480 U.S. at 140.

85. Defendants cannot rely on *Smith* to defend their infringement of Plaintiff's free exercise. *See supra*, ¶¶ 74-80. Strict scrutiny applies. *See supra*, ¶ 74.

86. Defendants fail to satisfy any form of heightened scrutiny, *see, e.g.*, *City of Newark*, 170 F.3d at 365-67, let alone strict scrutiny. *See supra*, ¶ 77.

## SECOND CLAIM:
## VIOLATION OF THE NJLAD

87. Plaintiff repeats and realleges each of the allegations of this Complaint.

88. The NJLAD prohibits "impos[ing] upon a person as a condition of . . . retaining employment . . . any terms or conditions that would require a person to violate or forego a sincerely held religious practice or religious observance . . . *unless, after engaging in a bona fide effort,* the employer *demonstrates* that it is unable to reasonably accommodate the employee's religious observance or practice *without undue hardship* on the conduct of the employer's business." N.J.S.A. 10:5-12(q)(1) (emphases added).

89. As discussed above, Defendants are governed by the NJLAD but have failed to fulfill both of those statutory obligations. *See supra*, ¶¶ 3-7 & 35-67.

90. Each of these failures is an "unlawful employment practice." N.J.S.A. 10:5-12(q)(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

a. Declaratory judgment that the acts and omissions of Defendants described herein violate the laws of the United States and the State of New Jersey;

b. Permanent enjoinment of these legal violations;

c. Compensatory damages;

d. Nominal damages;

e. Punitive damages for Defendants' wanton and willful disregard of Plaintiff's rights;

f. Reasonable attorneys' fees, expenses, and costs, including, but not limited to, court costs, expert fees, and all attorneys' fees incurred by Plaintiff; and

g. Any other relief the Court deems just and appropriate.[4]

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

**Dated:** June 18, 2021

**By:**
/s/ Alex G. Leone
**Alex G. Leone**
**P.O. Box 1274**
**Maplewood, NJ 07040**

---

[4] On an email to Defendant Imhof cc'ing all named individual defendants, Plaintiff asked: "Are there any people other than those cc'd on this email who have participated in the process of considering and denying the request?" Neither Defendant Imhof nor any Defendant answered this question. *See* Ex. G. Accordingly, Plaintiff reserves the right to amend the Complaint to add additional defendants if appropriate in light of discovery.