**UNITED STATES DISCTICT COURT**
**DISTRICT OF NEW JERSEY**
_____x

| | | |
|---|---|---|
| **ALEX G. LEONE,** | : | **REPLY IN SUPPORT** |
| **Plaintiff,** | : | **OF MOTION FOR** |
| **v.** | : | **PRELIMINARY** |
| | : | **INJUNCTION** |
| **ESSEX COUNTY PROSECUTOR'S OFFICE,** | : | Docket No. 2:21-cv-12786 |
| **THEODORE STEPHENS II,** | : | **Motion Day:** |
| **ROMESH SUKHDEO,** | : | September 7, 2021 |
| **GWENDOLYN WILLIAMS,** | : | |
| **and** | : | |
| **ROGER IMHOF,** | : | |
| **in their individual and official capacities,** | : | |
| **Defendants.** | : | |

_____x

## TABLE OF CONTENTS

**Introduction**……………………………………………………………………… p. 2

**Argument** …………………….……………………………………..………… p. 2

**Conclusion**………………………………………………….……………… p. 28

## TABLE OF AUTHORITIES

*Alabama Ass'n of Realtors, et al. v. Dept. HHS, et al.*, 594 U.S. __ (August 26, 2021)p. 5

*Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. __ (June 17, 2021)…………p. 4

*Tandon v Newsom*, 141 S. Ct. 1294 (2021)………………………………………p. 4

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam)…..p.20

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014)…………………………p.10

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006)…p .3

*Ashcroft v. American Civil Liberties Union*, 542 U.S. 656 (2004)…………...………..p. 3

*Hobbie v. Unemployment Appeals Commission*, 480 U.S. 136 (1987)………………p. 12

*Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707 (1981)….p.10

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017)…………………………….p. 3

*Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002)……………p. 20

*Fraternal Order, Police Newark v. City, Newark*, 170 F.3d 359 (3d Cir. 1999)……..p. 5

**INTRODUCTION**

In their legal arguments, Defendants fail to cite the applicable legal standards; conspicuously omit binding and on-point cases, citing only one of the Supreme Court's precedents on religious liberty only in passing; and make multiple clearly identifiable legal errors. In their assertions on the facts, Defendants offer virtually no evidence and fail to identify any concrete fact or specific example that could even conceivably justify their totally untailored religious discrimination—instead resorting to mischaracterizations, if not downright misrepresentations.

Plaintiff replies to each of these sets of fatal issues below.[1]

**ARGUMENT**

**I.      Defendants' Legal Arguments**

Defendants' legal argument section is sloppy, to say the least.

**A.  Likelihood of Success on the Merits**

*First*, after opening with citations to three unpublished cases,[2] Defendants cite a defunct case that misstates the preliminary injunction standard. (*See* Opp. at 9 (citing *NutraSweet Co. v. Vit–Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)). In a precedential opinion, the Court of Appeals identified *NutraSweet*—down to Defendants' exact pincite—as part of an "inconsistent line of cases" that "compounded subtle misinterpretations of . . . longstanding jurisprudence," and went on to clarify the

---

[1]      Citations in this brief will be as follows: to the Complaint (D.E. No. 1) as "Compl." and its exhibits as "Compl. Ex. __"; to the Memorandum (D.E. No. 8-1) supporting the Motion for Preliminary Injunction (D.E. No. 8) as "MPI Br." and the exhibits to the Motion as "MPI Br. Ex. __"; and to Defendants' Brief (D.E. No. 11) as "Opp."

[2]      (*See* Opp. at 9 (citing *Checker Cab of Philadelphia Inc. v. Uber Techs., Inc.*, 642 F. App'x 229, 231 (3d Cir. 2016); *Exec. Home Care Franchising LLC v. Marshall Health Corp.*, 642 F. App'x 181, 183 (3d Cir. 2016); *Julius Realty Corp. v. Thompson*, 2020 WL 2539188 (D.N.J. May 19, 2020))). Unpublished cases "are not binding." *El v. City of Pittsburgh*, 975 F.3d 327, 340 (3d Cir. 2020).

applicable standard. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 177 (3d Cir. 2017).
Whereas Defendants incorrectly state that "of course" "[a] plaintiff's failure to establish
any element in its favor renders a preliminary injunction inappropriate"—and would strip
the Court of its discretion to weigh all four preliminary injunction factors—the correct
standard is more favorable to Plaintiff:

> [A] movant for preliminary equitable relief must meet the
> threshold for the first two "most critical" factors: it must
> demonstrate that it can win on the merits (which requires a
> showing significantly better than negligible but not
> necessarily more likely than not) and that it is more likely
> than not to suffer irreparable harm in the absence of
> preliminary relief. If these gateway factors are met, a court
> then considers the remaining two factors and determines in
> its sound discretion if all four factors, taken together,
> balance in favor of granting the requested preliminary
> relief.

> *Id.* at 179 (footnotes omitted).

**Then**, Defendants—either ignorantly or intentionally[3]—omit an aspect of the
preliminary injunction analysis crucial "*in First Amendment cases*:" A plaintiff moving
for a preliminary injunction "must be deemed likely to prevail" on the merits *unless the
government justifies its infringement of First Amendment liberty under the appropriate
level of scrutiny. See Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 666
(2004); *Reilly*, 858 F.3d at 180 (emphasis added). Here—as explained in Plaintiff's brief
(MPI Br. at 5-14) and again below—"the [g]overnment failed" to do so: Defendants do
not even come close. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418, 429 (2006); (MPI Br. at 5-14).

---

[3]     Because Defendants' counsel is a law partner and chair of her law firm's
"Complex      Commercial      Litigation"      practice      group,
https://www.genovaburns.com/attorneys/kathleen-barnett-einhorn, and because Plaintiff
previously cited *Reilly* and its applicable standards several times (MPI Br. at 5, 6 & 14),
it is difficult to avoid the inference that this omission was intentional.

But not only have Defendants omitted this important aspect of the applicable legal standard—and utterly failed to carry their burden under it—*they have illicitly attempted to shift the burden to Plaintiff* to explain why their proposed "accommodations" are unreasonable.  (*See, e.g.*, Opp. at 13 (asserting that "the Court need not address" Defendants' burdening of Plaintiff's free exercise "because the ECPO has . . . offer[ed] reasonable accommodations to Plaintiff")).  It is easy to explain why Defendants' proposed "accommodations" are unreasonable, and Plaintiff will do so, for the fourth time,[4] below.  But to be clear, Defendants' illicit attempt to shift that burden to Plaintiff has no basis in law—and is even directly contradicted by the state law governing Defendants.  *See* N.J.S.A. 10:5-12(q)(1) (providing that an employer cannot "require a person to violate or forego a sincerely held religious practice" *unless the employer "demonstrates" that accommodating the religious practice would cause "undue hardship"*); (Opp. at 12 (recognizing this legal requirement)).

***Next***, Defendants fallaciously argue that because some or all employees "were required to return [physically] to work on August 2, 2021"—or because Defendants are not *at this moment* granting secular exemptions from the requirement that employees be physically present in the office—their policies are "neutral and generally applicable." (*See* Opp. at 10-11).  This fallacious argument, however, "misapprehends the issue:"  The Supreme Court has foreclosed Defendants' argument—actually, stronger versions of it— twice over.  *See Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. ___, ___ (slip op.) at 10 (June 17, 2021); *Tandon v Newsom*, 141 S. Ct. 1294, 1297 (2021).[5]

---

[4]     (*See* Compl. Ex. E at 7-9; Compl ¶¶ 47 & 55-59; MPI Br. at 4 & 13).

[5]     Defendants do not cite *Fulton* even one time, not even when discussing the requirements of neutrality and general applicability, which the Court directly addressed in *Fulton* only months ago.  (*See* Opp. at 10); *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. ___, ___ (slip op.) at 5-7 (June 17, 2021).  It is understandable why Defendants would want to pretend *Fulton* does not exist:  It is a binding Supreme Court case that

- In *Fulton*, the Supreme Court made clear that having "a formal mechanism for granting exceptions" *at all* "renders [Defendants'] policy not generally applicable, regardless whether any exceptions" are currently given *or even whether any exceptions ever have been given*. *Fulton*, (slip. op.) at 10.[6]  This is so because it permits the government "to decide which reasons for not complying with the policy are worthy of solicitude." *Id.*  Here, not only *may* Defendants' "decide which reasons for not complying with the[ir] [physical presence] policy are worthy of solicitude:" They in fact decided during more than a year that secular reasons are "worthy of solicitude" but that religious reasons are not *and never are*. *See id.*  Moreover, Defendants may exercise the arbitrary discretion accorded to them under their formal or informal exemption policies at any time and decide *again* that secular reasons are worthy of solicitude *while continuing to discriminate against religion*. *See, e.g.*, *Alabama Association of Realtors, et al. v. Department of Health and Human Services, et al.*, 594 U.S. __, __ (slip op.) at 8

---

severely undermines, if not outright refutes, their entire position and shows clearly that preliminary relief should be granted.

[6]      Defendants may attempt to argue that because they do not have a *formal* mechanism for granting exemptions from the requirement that employees report physically for work, they are not subject to the legal analysis in *Fulton*.  Defendants apparently do have a formal mechanism, or several, for granting exemptions from that requirement.  (*See, e.g.*, MPI Ex. A ¶¶ 10-11; MPI Ex. C; Opp. at 1-2 (describing the deliberative processes underlying Defendants' decisions to permit certain employees to work from home at certain times); Opp. at 5-6 (describing the formal process Defendants claim they followed when considering Plaintiff's request for an exemption)).  But "formal" or "informal," the argument would make no sense:  *The very potential* for granting exemptions, *Fulton* makes clear, is the problem; and an *informal* system depending *even more* on Defendants' arbitrary discretion poses an *even greater threat* of religious discrimination.  *See Fulton*, (slip op.) at 10.  Stated simply, the Supreme Court's "concern [i]s the prospect of the government's deciding that secular motivations are more important than religious motivations,*" Fraternal Order, Police Newark v. City, Newark*, 170 F.3d 359, 365 (3d Cir. 1999), *and that is precisely what Defendants have done here—*and in the absence of preliminary relief, would be permitted to continue to do.

(August 26, 2021) ("It is indisputable that the public has a strong interest in combating the spread of the COVID–19 Delta variant."); *Hospital visitor restrictions return in parts of New Jersey as COVID cases spike*.[7]  Stated simply, the Supreme Court's "concern [i]s the prospect of the government's deciding that secular motivations are more important than religious motivations,*" Fraternal Order, Police Newark v. City, Newark*, 170 F.3d 359, 365 (3d Cir. 1999), *and that is precisely what Defendants have done here*—and in the absence of preliminary relief, would be permitted to continue to do.

- In *Tandon*, which Defendants also pretend does not exist, the Supreme Court made clear that "*even if the government withdraws*" a restriction on free exercise, *a plaintiff "otherwise entitled to emergency injunctive relief remain[s] entitled"* when he "remain[s] under a constant threat" the government will use its "power to reinstate the challenged restriction[]" on free exercise.  *Tandon,* 141 S. Ct. at 1297 (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (per curiam))) (emphases added).  Here, Plaintiff remains not only under a "constant threat" of free exercise infringement:   Defendants' free exercise infringement against Plaintiff has never ended—*and was recently increased by 100%—let alone the discriminatory policy resulting in the infringement actually "withdraw[n]." See id.*; (Compl. Ex. D. at 2-3 (stating Defendant's policy of categorically discriminating against a religious accommodation even "in the future")).  And despite Defendants' August 2 shifting of who must be physically present in the office or when, Defendants' discretion to grant exemptions and

---

[7]     North Jersey.com, (Aug. 19, 2021),
https://www.northjersey.com/story/news/coronavirus/2021/08/19/southern-nj-hospitals-limit-visitors-covid-cases-spike-delta-varient/8199037002/.

permit employees to work from home for secular reasons *may again be exercised at any time*. *See Tandon*, 141 S. Ct. at 1297; *Alabama Association*, (slip op.) at 8; (*see, e.g.*, *supra*, note 7).  In other words, as observed above, Defendants maintain arbitrary discretion to favor secular reasons for working from home over religious reasons.  This is precisely the kind of discretion the Supreme Court has said is *not* neutral and generally applicable and squarely raises—and, here, actualizes—the Court's concern that the government will engage in religious discrimination.  *See Fulton*, (slip. op.) at 10; *Fraternal Order*, 170 F.3d at 365.

*In addition*, regardless of their treatment of others for secular reasons, Defendants intentionally discriminated against religion in denying the Request for Accommodation, *explicitly and categorically singling out religion as* never *an adequate basis to permit work from home*.  (Compl. Ex. D at 2 (categorically asserting that religion can *never* justify working from home *at all* "presently or in the future").  This "decision to provide medical exemptions while [*categorically*] refusing [a] religious exemption[] is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny." *See Fraternal Order*, 170 F.3d at 365; *id.* (noting that it is *even more problematic* when a government employer permits a "categorical exemption" for secular reasons "but not for . . . religious" reasons).  Defendants' discriminatory intent has continued from that decision *until this day*:  It does not cease to exist simply because Defendants have decided to treat others differently for secular reasons, and Defendants' hostility to religion is shockingly evident *even in their brief*.  (*See, e.g.*, Opp. at 5, 6 &17 (derisively referring to the religious need to pray in scarequotes multiple times); Opp. at 3 (derisively referring to Plaintiff's prayer practice as a "moving" "target")).

Therefore, there are *three reasons each of which is independently sufficient* **to reject Defendants' contention that their discretionary policies are neutral and generally applicable.** (*See also* **Compl. ¶¶ 72-76; MPI Br. at 7-9**).

*Finally*, and tellingly, Defendants argue only that rational basis scrutiny applies and that their religious discrimination "withstands the low bar of rational basis scrutiny."[8] This is a pipedream and deliberate disregard for the applicable standard announced by the Supreme Court. *See, e.g.*, *Fulton*, (slip op.) at 6; *Tandon*, 141 S. Ct. at 1296; *see also Fraternal Order*, 170 F.3d at 366. As Plaintiff had twice explained, strict scrutiny applies three times over. (*See* Compl. ¶¶ 72-76; MPI Br. at 7-9). And similar to their failure to cite the applicable preliminary injunction standards (and *Fulton* and *Tandon*), Defendants' fail to cite the Court of Appeals's binding decision in *Fraternal Order*, *which is on all fours with this case and shows clearly that heightened scrutiny applies and that preliminary relief should be granted*. (*See* MPI Br. at 10-11). *Defendants do not even attempt to distinguish* Fraternal Order; they literally do not even cite it even one time.[9]

On the merits, Plaintiff needed only to make "a showing significantly better than negligible:" that he "*can* win on the merits." *See Reilly*, 858 F.3d at 179 (emphasis added).

---

[8]   It does not:  Because Defendants' discrimination is motivated by unlawful intent, is totally untailored, and is shot through with inconsistencies, it would not pass even the most minimal level of scrutiny, let alone a heightened level of scrutiny, let alone strict scrutiny. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 632-33 (1996); (MPI Br. at 12 n.5).

[9]   The loosely relevant cases Defendants *do* cite plainly support the application for preliminary relief. *Compare, e.g.*, *McTernan v. City of York*, 564 F.3d 636, 647 (3d Cir. 2009) ("Government action is not neutral and generally applicable . . . if it burdens religiously motivated conduct but exempts substantial comparable conduct that is not religiously motivated."), *with* Compl. ¶ 75 (Defendants have "prohibit[ed] religious conduct," i.e., working from home as necessary to pray, "while permitting secular conduct," i.e., working from home for secular reasons, which "undermines the government's asserted interests in a similar way"—in fact, the same exact way. (citing *Fulton*, (slip op.) at 6)); *see also McTernan*, 564 F.3d at 650-51 (suggesting that even when the government asserts an "interest in *safety and avoiding collisions*" its discrimination should be enjoined if its means of advancing its asserted interest are not narrowly tailored (emphasis added)).

8

Plaintiff easily made this showing.  (*See* MPI Br. at 5-14).  In contrast, Defendants do not even come close to discharging their duty to justify their burdening of Plaintiff's free exercise, having eked out only a dubious argument that they pass mere rational basis scrutiny.  (*See supra*, note 8).  Accordingly, Plaintiff "must be deemed likely to prevail" on the merits.  *See Ashcroft*, 542 U.S. at 666; *Gonzales*, 546 U.S. at 429; *Reilly*, at 180.

**B.  Irreparable Harm**

On the issue of irreparable harm, Defendants continue to make clearly identifiable errors of law and fact.[10]

***First***, Defendants entirely omit the controlling standard provided directly by the Supreme Court:  A person is "irreparably harmed by the loss of free exercise rights '*for even minimal periods of time*.'" *Tandon*, 141 S. Ct. at 1297 (emphasis added) (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020)).  As if this standard and Plaintiff's analysis of it were not sufficient to find this factor in favor of Plaintiff here (*see* MPI Br. at 14-15)—where Defendants' infringement of free exercise is not only not "minimal" in duration but *categorical and permanent—Defendants' themselves apparently concede that Plaintiff is suffering irreparable harm*:  "The harm allegedly suffered by Plaintiff . . . is difficult, if not impossible, to quantify and thus even more challenging to remedy."  (*See* Opp. at 3); *Ramsay v. Nat'l Bd. of Med. Examiners*, 968 F.3d 251, 262 (3d Cir. 2020) (defining irreparable harm).

---

[10]     As in the preceding section, Defendants again open with citation to an unpublished case and again cite a defunct case on which the Court of Appeals cast doubt in *Reilly*.  (*See* Opp. at 14 (citing *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987)); *Reilly*, 858 F.3d at 177 (discussing *ECRI*).

Defendants also cited *ECRI* in their dubious attempt to bully Plaintiff into withdrawing the instant motion.  (D.E. No. 10-1 (Ex. A)).  As is now clear, counsel's letter was premised on a negligent lack of basic legal research—and sheer bad faith at worst—further strengthening the inference that *the attempt to bully Plaintiff into withdrawing the instant motion was unlawful and further undermining the defamatory assertion that the motion "is frivolous." See id.*; (*infra*, note 22).

*Then*, having correctly recognized that "Plaintiff's religious beliefs are sincerely held" (Opp. at 3), Defendants illegitimately attempt to dispute that "Plaintiff must forego prayer when he is in the office" (Opp. at 14-15).  Yet Plaintiff has stated (and declared under penalty of perjury) unequivocally:

> When physically present in the office, I am forced to forgo a prayer practice I engage in throughout every work day. (I engage in this practice every day except Sunday.)  My religious belief is that the peace and solitude required for this practice are impossible in the office.

(MPI Ex. A ¶ 13; *see also, e.g.*, Compl. ¶¶ 19-27).

As the Supreme Court has made clear, "it is not for [courts] to say that . . . religious beliefs are mistaken or insubstantial.  Instead, [thei]r 'narrow function . . . in this context is to determine' whether the line drawn reflects 'an honest conviction;'" and, here, "there is no dispute that it does."  *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014) (quoting *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 716 (1981)); (Opp. at 3).  Yet Defendants would have the Court disregard this rule and enquire whether Plaintiff's religious convictions *really* require Plaintiff to pray audibly and spontaneously in peace and solitude outside the office, requiring him to forgo his prayer practice while in the office.  What's more:  Defendants have repeatedly suggested that it is appropriate to dissect "a specific provision in Christianity" to determine whether granting the requested accommodation is appropriate.  (Opp. at 6; Compl. Ex. D at 1; *see also* Compl. Ex. E at 9 n.5; Compl. n.2).[11] *See Thomas*, 450 U.S. at 715 ("Courts should not undertake to dissect religious beliefs.").

---

[11]    If Defendants are interested in "a specific provision in Christianity" relevant to Plaintiff's prayer practice, they could consult the Bible.  *See, e.g.*, Genesis 1:1; Exodus 15:26; Deuteronomy 10:14; Joshua 1:9; I Kings 4:29-33; I Chronicles 16:8; Nehemiah 2:4-5; & 9:4-6; Job 26:13, 38:4 & 38-41; Psalms 1:1-3, 8:3-5, 19:1-2, 30:11-12, 35:28, 40:16-17, 51:15-17, 63:5, 64:1, 66:19, 71:8 & 24, 89:1 & 11, 94:18-19, 95:1-5, 102:25, 104:14-17 & 33, 107:41, 119:12-13 & 148:7-10; Isaiah 44:24 & 51:13; Jeremiah 17:14; Ezekiel 1:1; Amos 9:6; Matthew 5, 6:3-4, 6:5-6, 6:17-18, 6:26-29, 8:7, 14:23, 22:37-40

*Next*, Defendants fallaciously assert that, because Plaintiff is "fully willing to be physically present for anything required by [his] job responsibilities," he does not suffer irreparable harm when discriminatorily forced to forgo his prayer practice.  (*See* Opp. at 15).  Of course, irreparable harm occurs here *as a result of Defendants' unlawful discrimination*—but requiring Plaintiff to be physically present in order to fulfill his job responsibilities would not be unlawful discrimination, because the same requirement applies to all employees when work from home is permitted by Defendants for secular reasons, and Plaintiff has never even asked to be absolved of any job responsibility to begin with.  (*See, e.g.*, Compl. Exs. A & B).  He asked simply that the status quo that extended a work-from-home accommodation to employees for secular reasons be extended to him for religious reasons.  (*See, e.g.*, Compl. Ex. C).

But in discriminatorily requiring Plaintiff to be physically present *irrespective of his job responsibilities*,[12] Defendants are refusing to extend that same accommodation accorded to all employees for secular reasons:  requiring their physical presence *only* "*based on the needs of the office*."  (*See* Compl. 45-46 & MPI Br. at 13 (quoting Compl. Ex. D at 2)).  Hence Defendants fallaciously conflate the forgoing of Plaintiff's prayer practice *at all*—which may incidentally occur as a result of being in the office when

---

& 25:31-46; Mark 1:35-36, 6:46 & 7:34; Luke 2:13-14, 12:22-28, 18:9-14 & 23:34; John 1:1, 12:44 & 17:1-2; Acts 1:10-11 & 6:2-4; Romans 1:20; II Corinthians 10:3-5; Ephesians 1:15-16, 6:1-4 & 6:13-18; Philippians 4:6; Colossians 4:2; I Thessalonians 5:16-18; Hebrews 13:15; James 1:27; Revelation 21:9-11.

[12]   The illogic of Defendants' discrimination against religion is plainly evident in their "offers" of "accommodations"—for instance, Defendants would generally *permit* Plaintiff to be physically out of the office to range "a four hundred (400) acre [public park] . . . *so long as it does not adversely impact [his] work responsibilities*" (Compl. Ex. D at 3 (emphasis added)), but *never* permit Plaintiff work at his nearby home, where he can actually pray and work consistent with his job responsibilities, on the very same condition (*see, e.g.*, Compl. ¶ 58; MPI Ex. A ¶¶ 13-17).  These putative "accommodations" will be addressed again below.

reasonably necessary—with irreparable harm, which occurs only when forgoing the prayer practice *is a result of Defendants' unlawful discrimination*. Plaintiff already observed that forgoing his prayer practice "is sometimes an unavoidable consequence of life." (Compl. ¶ 26). To attempt to use this commonsense observation against Plaintiff is legally fallacious and highly inappropriate.[13]

**Additionally**, and again fallaciously, Defendants suggest that their religious discrimination "does not cause [Plaintiff] irreparable harm" because "he was able to work full time in the office" before the pandemic. (*See* Opp. at 15; Opp. at 3 (calling this observation "critically" important)). It is true that Plaintiff worked in a different unit of the office for several months before the pandemic and during that time sought only other religious accommodations. Yet, again, the Supreme Court puts the lie to Defendants' fallacy: "The First Amendment protects the free exercise rights of employees who adopt religious beliefs or convert from one faith to another after they are hired;" and "[t]he timing" of when an employee chooses to begin engaging in a religious practice "is immaterial" to determining whether an employer burdens his free exercise rights and causes him irreparable harm. *Hobbie v. Unemployment Appeals Commission*, 480 U.S. 136, 144 (1987). Defendants do not cite *Hobbie*; and other than *Smith* on one page in passing (Opp. at 10), *they do not cite any Supreme Court precedent on religious liberty*.

---

[13]    The upshot of Defendants' observation that "there is no distinctive difference between coming in on a Monday versus a Wednesday," if any, is unclear. (*See* Opp. at 15). As made clear in his brief, "Plaintiff has been using 'accrued time' . . . for multiple days during weeks Defendants have arbitrarily required Plaintiff to forgo his prayer practice"—now, every week (*see* MPI Ex. C)—which "prevent[s] irreparable harm to Plaintiff on at least those days." (*See* MPI Br. at 13-14). The need to use accrued time this way arises solely because of Defendants' unlawful religious discrimination. The only reason Plaintiff does not use accrued time on both "Monday" *and* "Wednesday" is because it "will run out" (*see* Compl. MPI Ex. B); and Defendants have threatened to penalize Plaintiff if he works from home as necessary to pray—*completely consistently with his job responsibilities*—without using accrued time (*see, e.g.*, Compl. Ex. D at 2-3)

### C.  Balancing of the Equities

Defendants already concede that "[t]he harm allegedly suffered by Plaintiff . . . is difficult, if not impossible, to quantify and thus even more challenging to remedy." (*See* Opp. at 3).  They also concede that Plaintiff has identified additional harm he is suffering—"adverse spiritual, psychological and even physical effects"—but that this formulation is not "specific" enough in Defendants' estimation. (*See, e.g.*, Opp. at 15). Defendants could have answered their own desire for specificity by actually reading the Complaint and other record documents:  In addition to the irreparable harm of burdened free exercise, Plaintiff has identified numerous specific examples of harm inflicted on him by Defendants' unlawful discrimination:  "experiencing anxiety or dread during time in the office as well as during nights before going to the office;" "being unable focus on and complete work efficiently;" "suffering sleep problems or headaches;" and bearing the unfair financial disadvantage of being forced by Defendants to use accrued time in order to engage in his prayer practice; *and more*. (*See* Compl. ¶ 25; MPI Ex. B; *see also* MPI Br. at 15 ("Plaintiff often works from home normally and efficiently even on days when using accrued time")).  Yet, despite their desire for specificity when they hope it will harm Plaintiff's case, Defendants *still* have not identified a single specific fact or concrete example in support of their totally untailored religious discrimination.

In contrast to Plaintiff, Defendants claim, Defendants would suffer "actual harm" if the Court granted preliminary relief. (Opp. at 18).  This assertion is as unfounded now as it was when Defendants first made it (Compl. Ex. D at 2-3) and then refused to defend it (Compl. Ex. G). The past several months have made this abundantly clear:  None of the purported reasons Defendants gave for categorically prohibiting Plaintiff's prayer practice has ever applied. (*See* MPI Ex. A ¶¶ 3-6).  The extent of "actual harm" identified by Defendants is limited to the paragraph of vague assertions in their memorandum that

initially denied Plaintiff's request for a religious accommodation. (*See* Opp. at 17-18 (citing Compl. Ex. D at 2-3)).   These vague assertions have already been debunked—repeatedly.  (*See, e.g.*, Compl. Ex. E at 2-6; Compl. ¶¶ 35-67; MPI Br. at 12-14; *see also* MPI Br. at 12 n.5).  And the Supreme Court has made clear that stating putative interests "at a high level of generality" is not sufficient to justify Defendants' discrimination: "the First Amendment demands a more precise analysis."  *See Fulton*, (slip op.) at 13-14.

But not only have these vague assertions been repeatedly debunked:  *Even now Defendants fail to offer a single concrete fact or specific example in support of them*, as is evident from the certification of Defendant Imhof.  (Opp. Ex. B).[14]  Other than a press release (Opp. Ex. A), the certification of Defendant Imhof is *the only putative evidence offered by Defendants*—yet it contains only vague assertions and uncontested observations *without citing any concrete fact or specific example* that could even potentially justify Defendants' religious discrimination.

A particularly telling example is Defendants' repeated, vague assertions regarding "emergent matters" (Opp. Ex. B at ¶ 8), that "emergent matters that arise may require immediate response that would necessitate [Plaintiff's] presence in the office" (Opp. at 18 (citing Compl. Ex. D at 2)).  To someone who has no idea what is going on, that statement could potentially sound persuasive.  But as Plaintiff has made clear (and declared under penalty of perjury):  During the entirety of a year in Plaintiff's present position, "there has never been an emergent matter that necessitated [his] immediate physical presence in the office;" and Plaintiff is not even "sure what such a hypothetical scenario would be like," nor do Defendants provide any insight on this mystery even now.

---

[14]      Defendant Imhof's certification fails to comply with 28 U.S.C. § 1746 (e.g., it fails to certify "under penalty of perjury").  *See* L. Civ. R. 7.2(a) (listing "affidavits, declarations, [and] certifications" in reference to 28 U.S.C. § 1746).  Regardless, as explained above, it does not controvert any material fact in the record.

(*See, e.g.*, MPI Ex. A ¶ 4; Compl. ¶ 40).  Plaintiff's testimony is entirely uncontroverted and the closest Defendants even come to addressing it is the additional vague assertion that "emergent matters . . . often arise in Plaintiff's line of work."  (*See* Opp. at 13-14).  Yes, emergent matters often arise within a legal "line of work" generally—but not in Plaintiff's employment specifically.  (*See, e.g.*, MPI Ex. A ¶ 4; Compl. ¶ 40).  Defendants apparently do not even try to dispute this fact.  Nor do Defendants explain why in the event such a rare and hypothetical scenario comes to pass "Plaintiff could not simply drive to the office immediately" from his nearby home.  (*See* Compl. ¶¶ 40 & 65; *see also* Compl. Ex. E at 5 n.3 ("The drive to the office from [Plaintiff's] home is approximately twenty minutes.")).

Another telling example is Defendants' continued, misplaced reliance on potential in-person obligations such as witness interviews or court presentations.  (Opp. Ex. B at ¶ 8).  As Plaintiff made clear before filing this action, and even clearer when he declared under penalty of perjury in his motion papers:  "To be clear, and to reiterate, the requested accommodation would not interfere with in-person observation of witness interviews" or court appearances (Compl. Ex. E at 2); "*all in-person court appearances, witness interviews, or other in-person obligations for which [Plaintiff] ha[s] been responsible have proceeded normally and efficiently, including on days [he] was working from home*" (MPI Ex. A ¶ 3 (emphasis added)).  Plaintiff is "fully willing to be physically present for anything required by [his] job responsibilities—including, for instance, in-person court appearances, witness interviews, or any other obligation." (MPI Ex. A ¶ 9).  Again, *this testimony is entirely uncontroverted and Defendants do not address it factually.*

Additionally—and, predictably, vaguely—Defendants appeal to "collaborat[ion]" (Opp. Ex. B at ¶ 8) and "*ad hoc* meetings" (Opp. at 13). Yet Defendants again fail to offer evidence on this putative interest, and fail to controvert Plaintiff's evidence:  Ad hoc

meetings are rare (Compl. ¶ 38), like in-person meetings generally (Compl. Ex. E at 4); "ad hoc" meetings conducted in person in the office have been indistinguishable from "ad hoc" meetings conducted electronically while working from home (MPI Ex. A ¶ 5); and electronic meetings are "efficient or even seamless" and are often Defendants' and Plaintiff's supervisor's chosen method of meeting (Compl. ¶ 39). *Defendants utterly fail to explain with any fact or example* why permitting Plaintiff to participate in such meetings or collaboration electronically would "requir[e] unreasonable expense or difficulty [or] unreasonable interference with the safe or efficient operation of the workplace"—or how doing so would place even a small burden on Defendants. (Compl. ¶ 38 (quoting N.J.S.A. 10:5-12(q)(3)(a)).[15]

**As with each putative interest:  Defendants make a vague assertion at a high level of generality, *see Fulton*, (slip op.) at 13-14, without even trying to connect it to Plaintiff's employment specifically; Plaintiff debunks it with a clear explanation and citation to evidence; and Defendants fail to respond with anything but another vague assertion—let alone a shred of evidence to the contrary.**

In their brief and accompanying papers, Defendants illicitly attempt to supplement their rationale for religious discrimination—despite previously "st[anding] by" that plainly deficient rationale as the exclusive rationale for their religious discrimination. (*See* MPI Br. at 6 n.3 (citing Compl. Ex. G)).[16]  Regardless, the interests they attempt to

---

[15]     Plaintiff recognizes that in-person meetings may sometimes be reasonably necessary (Compl. Ex. E at 4 n.2) although they have generally been quite rare (Compl. Ex. E at 4 ("On very rare occasions—perhaps three over the course of the year—a supervisor scheduled an in-person meeting for which physical presence was requested but not immediately required.")).  *Again*, Plaintiff is *"fully willing to be physically present for anything required by [his] job responsibilities—including, for instance, in-person court appearances, witness interviews, or any other obligation."* (MPI Ex. A ¶ 9 (emphasis added)).

[16]     Defendants chose to "stand by" the reasons originally offered as the sole rationale for their religious discrimination, and refused to offer any additional reason when Plaintiff

smuggle in now are equally without merit.  For instance, after never mentioning the issue

before, Defendants now vaguely assert that "department heads . . . had been taking on

many of the responsibilities of assistant prosecutors" (*see* Opp. Ex. B at ¶¶ 5 & 8) but do

not even attempt to connect this vague assertion to Plaintiff.  Nor could they:  Plaintiff is

not aware of a single occasion on which a "department head," or anyone, "took on" any

of his job responsibilities, nor do Defendants identify even one such occasion.  Similarly,

after never mentioning a putative interest in Plaintiff's "growth and development"

through "observ[ation of] colleagues at other trials," they now cite this as a reason for

categorically discriminating against Plaintiff's religious practice.  (*See* Opp. Ex. B at ¶ 8).

Yet, *as with each putative interest debunked previously*, Defendants have provided zero

evidentiary basis in support of the putative interest:  Plaintiff is not aware of a single

occasion on which Defendants (or Plaintiff's supervisor) requested that Plaintiff observe

another attorney's trial—nor would Plaintiff have objected to doing so had Defendants

made this request.  *As explained repeatedly*:  Plaintiff is "fully willing to be physically

present for anything required by [his] job responsibilities—including, for instance, in-

person court appearances, witness interviews, or any other obligation," such as observing

a trial (MPI Ex. A ¶ 9); and, *again*, Plaintiff is fully willing to be physically present

*whenever* "accommodating [his] religious need would cause undue hardship."  (Compl.

Exs. A & B; Compl. Ex. E at 3; MPI Br. at 12 n.6).

---

asked Defendants *before filing this lawsuit*: "Neither you nor anyone else has any . . .
additional reason or explanation [for categorically denying Plaintiff's request for a
religious accommodation]?" (Compl. Ex. G). That Defendants are smuggling in new
reasons for their discrimination now—after requiring Plaintiff to sue and seek emergency
relief—means the reasons originally offered were pretextual:  at the very least, that they
were not the reasons that "actually motivate[d]" Defendants' decision to deny Plaintiff a
religious accommodation.  *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

Defendants—in their brief but, tellingly, not their certification—vaguely suggest that permitting Plaintiff to work from home as necessary to pray would lead to a lack of "availability" or "effectiveness decline." (Opp. at 19).  Yet they do not cite a single fact to support this vague suggestion and do not address Plaintiff's testimony to the contrary. (*See* MPI Ex. A ¶¶ 3-9 & 17).  Defendants have also apparently chosen to remain willfully ignorant of information known by Plaintiff's supervisor regarding Plaintiff's excellent availability and efficiency when working from home.[17]  For instance, when working from home, Plaintiff "completed assignments so quickly and thoroughly [(e.g., on May 6)] that it has surprised" his supervisor.  (Compl. Ex. E at 6 n.4).  And Plaintiff's availability when working from home—e.g., the frequency and speed with which he answers work related phone calls; his exemplary average response time to email communications; and his willingness to take on, or even volunteer for, and complete any assignment at any time, even outside of working hours—has always been exceptional.  (*See id.* ("For instance, while being permitted to work from home, I have volunteered additional assistance many times; have expressly remarked that I am happy to take more work; and have completed assignments so quickly and thoroughly that it has surprised my supervisor.")).  *And* being forced to forgo his prayer practice *hampers* Plaintiff's work efficiency:  Plaintiff's "prayer practice has never interfered in Plaintiff's work, work efficiency, or responsiveness to

---

[17]     A complete failure by Defendants to consult Plaintiff's supervisor regarding this highly relevant information would be an inexcusable failure in diligence.  *See* Fed. R. Civ. P. 11(b) (requiring "an inquiry reasonable under the circumstances"); New Jersey Rule of Professional Conduct 1.3 ("A lawyer shall act with reasonable diligence and promptness in representing a client."); L. Civ. R. 103.1(a); Compl. ¶ 65 (observing that Plaintiff's supervisor "could have informed Defendants" of relevant information).

In the alternative, if Defendants and Defendants' counsel consulted Plaintiff's supervisor and are aware of this highly relevant information but have hidden it from the Court, they apparently have "misle[d] the tribunal."  *See* New Jersey Rule of Professional Conduct 3.3(5); Fed. R. Civ. P. 11(b)(3) (requiring that "factual contentions have evidentiary support").

work communications.  *In fact, it greatly assists Plaintiff in his work.*" (Compl. ¶ 23 (emphasis added)).

Despite the transparent weakness of these vague, evidence-free "interests," Defendants assert that it is "quite clear that in balancing the equities, Defendants would be far more harmed by the granting of the preliminary injunction than Plaintiff would by its denial." (Opp. at 19).  Defendants would have the Court accept this assertion despite their concession that Plaintiff suffers irreparable harm—harm, in Defendants' words, "difficult, if not impossible, to quantify and thus even more challenging to remedy" (Opp. at 3)—as well as other harm (Opp. at 15) and despite offering *zero evidence* in support of *any harm* that Defendants would suffer if the Court were to grant preliminary relief (*see generally* Opp. Ex. B). Yet the assertion is not only totally unsupported *and* contradicted; it makes no sense to begin with:  If the Essex County Prosecutor's Office can maintain its important responsibility to serve the public *when everyone is working from home for secular reasons during a year* (*see* Opp. at 20), the Court should be "at a loss to understand" why Defendants are now saying they cannot permit a single person to work from home for religious reasons—*at all*, *ever*.  *See Fraternal Order*, 170 F.3d at 367.

### D.  Public Interest[18]

Defendants' arguments on this factor cannot pass the straight-face test.  After completely omitting concern for Plaintiff's professional development in the extraordinarily weak rationale they "st[ood] by" previously (*see* Compl. Ex. G; *supra*, note 16), Defendants now would have the Court accept as a foremost reason against granting the motion that permitting Plaintiff to work from home as necessary to pray

---

[18]    Continuing their string of failures to engage in basic legal research and consult Supreme Court precedent, Defendants have not noted that the balance-of-equities and public-interest factors "merge when the Government is the opposing party." *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  Because Defendants have distinguished these two factors for separate analysis, this reply's structure will reflect that distinction.

would be "harmful to public interest" because Plaintiff would not "adequately develop professionally." (*See* Opp. at 20). Defendants, however, cannot speculate and "assume the worst" simply because Plaintiff is seeking a religious accommodation. *See Tandon*, 141 S. Ct. at 1297; *Sherbert*, 374 U.S. at 407. Yet an assumption of the worst is exactly what Defendants' speculative assertion reduces to. (*See also* Opp. at 7 ("anticipat[ing]" that "remote work is insufficient"); Compl. Ex. E at 2 & 5 (explaining that vague "anticipation" and speculation about "some point in the future" cannot justify Defendants' categorical religious discrimination)). Furthermore, being forced to forgo his prayer practice—regardless of the "needs of the office" (*see* Compl. Ex. D at 2)—*severely hampers Plaintiff's professional development and wellbeing on multiple levels*. (*See* Compl. ¶ 25; MPI Ex. A ¶ 17).

Defendants' remaining attempts to make an argument in this section similarly fall flat: For instance, Defendants assert a "likelihood" that "working from home would cause difficulties in handling [a] burdensome case load." (Opp. at 20). But Plaintiff already refuted this non-point months ago: Defendants "conspicuously ignore[] the fact that [an accommodation granted] could be tailored if necessary in the future;" and "[a]t most, an increased workload may make the circumstances under which it is reasonably necessary to be in the office more frequent; *and*, "again, *such circumstances are contemplated by the Request for Accommodation*" itself. (Compl. Ex E at 5; Compl. Exs. A & B).

These weak attempts at arguments do not even come close to showing that it would be in the public interest to permit Defendants to continue to burden Plaintiff's free exercise: "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *See Am. Bev. Ass'n v. City and Cty. of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc); *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) ("[T]he public interest clearly favors the protection of constitutional rights.").

Even the public's *compelling* interest in *"[s]temming the spread"* of a virus *during a pandemic*, cannot justify totally untailored religious discrimination like Defendants'. *See, e.g.*, *Roman Catholic Diocese*, 141 S. Ct. at 67 (emphasis added); *Fraternal Order*, 170 F.3d at 366-67. And permitting Plaintiff to work from home as necessary to pray *would actually advance the public's interest in stemming the spread of the virus during this pandemic*. *See Alabama Association*, (slip op.) at 8; (*see, e.g.*, *supra*, note 7). Even though Defendants used this putative interest to suspend the requirement that *"all employees" report physically to work for prolonged periods* (Opp. at 2), they have apparently given it zero weight in their calculated decision to discriminate against Plaintiff's religious practice.

This is pure discrimination against religion: Defendants' discriminatory "value judgment that secular (i.e., medical) motivations . . . are important enough to overcome its general interest[s] . . . but that religious motivations are not" cannot stand. *See Fraternal Order*, 170 F.3d at 366; (MPI Br. at 5-16).

## II. Defendants' Factual Mischaracterizations (or Misrepresentations)

That Defendants' legal arguments are baseless, and because they utterly failed to carry their burden under the applicable standard, *see, e.g.*, *Reilly*, 858 F.3d at 180, suffice to refute their assertion that the Court should deny the motion. But several of Defendants' factual mischaracterizations—if not downright misrepresentations—require at least brief responses in support of the same conclusion:

- *Defendants' opening statement* falsely asserts that Plaintiff argues that Defendants' August 2 decision "to have all employees return to the office . . . constitutes a discriminatory policy in violation of [Plaintiff's] right to the free exercise." (Opp. at 1). To be clear, Defendants' August 2 exercise of discretion is a result of their policy, formal or informal, that permits Defendants to make value judgments about which

reasons are adequate to permit working from home:  Defendants' policy permits them arbitrary discretion to favor secular reasons for working from home over religious reasons, and they in fact exercised their discretion in that fashion for more than a year. The "discriminatory policy" itself, however, is Defendants' categorical discrimination against religion expressed explicitly in a memorandum:   According to that memorandum, *religion can never be an adequate basis to permit work from home as necessary to pray at all, to any extent, under any circumstances "presently or in the future."* (Compl. Ex. D at 2-3).  Even milder religious discrimination would violate the Free Exercise Clause, but here Defendants have chosen a position of extreme intolerance and hostility to religion glaringly evident not only in the facts of this case but even in their brief.  (*See, e.g.*, Opp. at 5, 6 & 17 (derisively referring to the religious need to pray in scarequotes multiple times); Opp. at 3).

- Defendants repeatedly make false assertions like, "Plaintiff [seeks] unilateral authority to simply come and go as he pleases, with no recourse available to his employer."  (Opp. at 4; *see also, e.g.*, Opp. at 3, 5, 8 (falsely accusing Plaintiff of seeking "unfettered authority to determine the nature of his employment") & 13).  To be clear, Plaintiff seeks only the *exact same accommodation that was extended to employees for secular reasons for more than a year*:  to work from home as a general matter and to be physically present whenever reasonably necessary or, as Defendants' put it, "based on the needs of the office." (*See* Compl. Ex. D at 1).[19]  In other words, Plaintiff simply requested that the "status quo continue" (Compl. Ex. C):  that the

---

[19]      Here, Plaintiff could again observe that he is "fully willing to be physically present for anything required by [his] job responsibilities—including, for instance, in-person court appearances, witness interviews, or any other obligation" (MPI Ex. A ¶ 9)—but only in an echo chamber of willful ignorance and religious animus would this not already be clear.

status quo that permitted "all employees [to] work[] from home full-time" for secular reasons (Opp. at 2) continue for Plaintiff for religious reasons.  This was made especially clear during the May 6 meeting (*see* Compl. ¶¶ 11-12) when Defendants' counsel, Ms. Courtney Gaccione, expressed puzzlement over the meaning of the term "status quo."  That was Plaintiff's request then and it is Plaintiff's request now.  Defendants attempt to mislead by mischaracterizing what Plaintiff is seeking, which was proven to be efficiently administrable for hundreds of employees for more than a year and, obviously, did not accord them "unfettered authority to determine the nature of [their] employment."  (Opp. at 8; MPI Br. at 12 n.5).[20]

- Defendants assert that their proposed "accommodations" are "generous" and "more than reasonable."  (Opp. at 16 & 17).  But these are not accommodations at all, which has already been explained to Defendants multiple times.  (*See* Compl. Ex. E at 7-9; Compl. ¶¶ 55-50; MPI Br. at 4).  They are better described as *anti-accommodations*, which not only would require Plaintiff to forgo his prayer practice but would also impose significant burdens on Plaintiff:

   (1)   Defendants' foremost "offer" of an "accommodation" is literally no accommodation:  that Plaintiff "may continue to engage in pray" under the circumstances which Plaintiff informed Defendants his religious convictions do not permit him to do so, *the circumstances from which Plaintiff requested an accommodation in the first place*.  (*See* Compl. Exs. A, B & D at 3; MPI

---

[20]      A variation on the flavor of the false assertions discussed in this paragraph is that "Plaintiff contends that unless the Court holds that Plaintiff can work exclusively from home, Plaintiff's rights under State and Federal law, will be unduly burdened."  (*See* Opp. at 13).  Plaintiff has never asked to work "exclusively from home"—this is a blatant mischaracterization or downright misrepresentation—and, in fact, he has made clear *on more than five occasions now* that he seeks to work from home *only when doing so would not impose a hardship on Defendants*.  (Compl. Exs. A & B; Compl. Ex. E at 3 & 10; Compl. ¶ 10; MPI Br. at 12 n.6).

Ex. A ¶ 13; *see also* Opp. at 16 (outrageously calling "let[ting] Plaintiff pray in his office . . . generous")).

(2)   Defendants' second offer of an "accommodation" would require Plaintiff to forgo the spontaneous nature of his prayer practice and commute to a nearby public park in order to pray. (Compl. Ex. D at 3). Defendants even concede that this "accommodation" would "curtail the spontaneous nature of [Plaintiff's] prayer and it would also subject [him] to being seen and heard by others." (Compl. Ex. D at 2). What's more: This "accommodation" would "require Plaintiff—multiple times every day, regardless of the weather—to cross a busy street twice, hike up and down wooded hills and muddy terrain in work attire, and search for [and hope to find] secluded areas spread across 400 acres"—all while away from his work computer. (Compl. ¶ 56). This list of burdens imposed on Plaintiff is non-exhaustive. In what sense any of this could be described as an "accommodation"—let alone a "generous" one—is a mystery.

(3)   Defendants' third offer of an "accommodation," similarly, would require Plaintiff to forgo the spontaneous nature of his prayer practice or the connection to creation that it requires. (*See, e.g.*, Compl. ¶ 21 (noting that an element of Plaintiff's prayer practice is "perceiving and contemplating the handiwork of the Creator, such as by looking up at the sky")). In other words, Plaintiff must refrain from praying until he commutes to a soundproof room with no windows and no connection to nature—or be confined to that room all day every day. (Compl. Ex. D at 3).

Defendants' "accommodations," therefore, are thinly-disguised efforts to force Plaintiff to change his religious practice. They also make no sense to begin

with:  For instance, Defendants would always permit Plaintiff to be out of the office to range "a four hundred (400) acre property . . . so long as it does not adversely impact [his] work responsibilities," but *never* permit Plaintiff to be out of the office to work at his nearby home as necessary to pray on the very same condition.  (Compl. Ex. D at 2-3).  ***This fact alone refutes Defendants' entire position (see* Compl. ¶¶ 44-51) and again shows that religious animus is the only plausible explanation for Defendants' categorical refusal to accommodate religion *at all*.**[21]

- Defendants assert that the "remote work [they] allowed" constituted "neutral measures applied to all employees equally."  (Opp. at 18).  But apparently Defendants do not have the facts of their own employment straight: Employees in some units were permitted to work at home fulltime while at the same time others (e.g., Plaintiff) were permitted to work at home only halftime, and Defendants shifted these policies around multiple times.  (MPI Ex. A ¶¶ 10-12; Compl. ¶¶ 16-18).  Defendants even considered and categorically denied Plaintiff's religious accommodation request—during April 26, 2021, to May 21, 2021—*during the very time they were already granting the exact same accommodation to other employees for secular reasons*.  (Compl. ¶ 81; MPI Ex A ¶¶ 10 & 11).  If this is not evidence of extreme hostility to religion, it is not clear what would be—short of explicit examples of derision such as those found in Defendants' brief.  (*See, e.g.*, Opp. at 5, 6 & 17; Opp. at 3).

- Defendants falsely assert that "Plaintiff requested to be transferred to the Appellate [Section] in an effort to not be bound by the impending schedule changes which would

---

[21]    As explained above, Defendants' illicit attempt to shift the burden to explain why those "accommodations" are unreasonable in order to prevail on this motion turns the law on its head.  *See Gonzales*, 546 U.S.at 429; *Ashcroft*, 542 U.S. at 666; *Reilly*, 858 F.3d at 180; *Fraternal Order*, 170 F.3d at 366; N.J.S.A. 10:5-12(q)(1); *see also Greater Phila. Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 133 (3d Cir. 2020) ("In First Amendment cases the initial burden is flipped.").

not permit him to work from home." (Opp. at 8). Plaintiff requested to transfer to the Appellate Section *in April*, when there were no "impending schedule changes," based on his genuine interest, the encouragement of a wise and respected colleague, and his belief that his abilities would better serve the office there. That "remote work is even more easily accommodated" there is, indeed, an additional reason Plaintiff would wish to transfer there (*see* MPI Ex. B) but raises the question why Defendants—who do not dispute that remote work *is* more easily accommodated there—have not so much as recognized this as a viable future accommodation (*see* MPI Br. at 14 n.7).

- Defendants assert —so falsely, and with such a palpable lack of self-awareness—that Plaintiff has been "clearly uninterested in a compromise of any nature." (*See* Opp. at 12). It is Defendants, however, that have inexplicably refused to accommodate Plaintiff's prayer practice "even by one day, hour, or minute" (Compl. ¶¶ 53, 54 & 78), *even while permitting others to work from home fulltime for secular reasons* (Compl. ¶ 81; MPI Ex A ¶¶ 10 & 11). Defendants also refused to provide any substantive reply to Plaintiff's "thorough and carefully-researched response" to their denial of his request for a religious accommodation (Compl. ¶ 60); and they even refused to respond when asked whether there was any way to appeal their extreme denial of Plaintiff's request, raising significant due process concerns (*see* Compl. Ex. G). Plaintiff, in contrast, endeavored to reason with Defendants in good faith before filing this action (*see* Compl. Exs. E, F & G) and informed Defendants shortly after filing this action that he is "always willing to work toward a just resolution"—a communication which Defendants entirely ignored. (MPI Ex. B; MPI Br. at 15). *Defendants have even inappropriately and ironically sought to use Plaintiff's willingness to be physically present at work when reasonably necessary against him.* (Opp. at 15).

26

- Defendants claim that the relief requested (MPI Br. at 17; D.E. No. 8-5) is "exceptionally vague" (Opp. at 4). The relief requested, however, is substantially identical to the relief granted and affirmed by the Court of Appeals in *Fraternal Order*, *see* 170 F.3d at 361 & 367, which is on all fours with this case, but that Defendants do not cite even one time. In *Fraternal Order*, the District Court enjoined the government employer "from disciplining or otherwise disadvantaging Plaintiffs . . . for violating Order 71-15 or any other directive which would require them to shave or trim their beards in violation of their religious beliefs." *Id.* at 361; (*see also* MPI Br. at 10-11 (discussing the overwhelming analogy of *Fraternal Order* to this case)). Here, Plaintiff has proposed that the Court enjoin Defendants "from disciplining or otherwise disadvantaging Plaintiff simply for praying in accordance with his religion, including at home on work days." (D.E. No. 8-5). But the word choice for any relief granted is fully within the Court's discretion and could just as easily say: "Defendants are enjoined from disciplining or otherwise disadvantaging Plaintiff for violating the May 12, 2021 Memorandum (Compl. Ex. D) that categorically discriminates against religion, or any other directive which would require him to forgo prayer in violation of his religious beliefs." The precise parallel to the relief granted in *Fraternal Order* is crystal clear. And Plaintiff—consistent with his desire *not* to impose hardship on Defendants and for the sake of clarity—added that the Court would "**not**" be enjoining "anything else, including disciplining Plaintiff or any employee for any act or omission inconsistent with any job duty, obligation, rule, or responsibility." (*See* D.E. No. 8-5). The requested relief would not only be clear and substantially identical to that granted in *Fraternal Order*: *Defendants would already know exactly what it*

*entails* because it would preserve the status quo under which the parties operated when Plaintiff was permitted to work from home for secular reasons.[22]

## CONCLUSION

Defendants' legal arguments are baseless; they neither carried their burden under the applicable standards nor cited any concrete fact or specific example in support of their discrimination; and by repeatedly mischaracterizing or misrepresenting facts—and even deriding religion in their brief—they rear the ugly face of their entrenched desire to burden Plaintiff's free exercise.

For the reasons discussed in Plaintiff's brief and reiterated herein, Plaintiff respectfully requests that the Court grant preliminary relief. [23]

Respectfully submitted,

/s/ Alex G. Leone
**Alex G. Leone**
**P.O. Box 1274**
**Maplewood, New Jersey 07040**
**aleone@jd16.law.harvard.edu**

---

[22]   The unfounded notion that the relief sought is "vague" was Defendants' foremost point in support of their defamatory assertion that the motion "is frivolous." (*See* D.E. No. 10-1 (Ex. A)). At minimum, the choice to send Plaintiff the letter containing that assertion now appears even more likely to have been highly unethical: Whereas that letter threatened that Plaintiff must "withdraw [the] motion" or else Defendants will "seek sanctions," *Defendants have not even attempted to argue in their brief that any aspect of the motion is frivolous—or that there is* any *basis for sanctions*. (*See id.*) Accordingly, it is difficult if not impossible to avoid the inference that the letter was simply a legally-baseless attempt to bully Plaintiff into withdrawing the motion so that Defendants could gain a strategic advantage in this case—an unethical embarrassment.

[23]   Plaintiff apologizes for the length of this brief and respectfully requests leave to file it without a separate docket entry and despite the page limit prescribed in the Local Rules. *See* L. Civ. R. 7.2(b). **Counsel for Defendants has consented.**
The length of this brief was determined not only by the need to illuminate Defendants' fundamental errors of law and to refute their factual mischaracterizations or misrepresentations, but also to leave no doubt regarding Defendants' defamatory assertion that the pending motion "is frivolous." (*See* D.E. No. 10 Ex. A; *see also supra*, note 22).

**CERTIFICATE OF SERVICE**

Alex G. Leone hereby certifies that this brief is served electronically on the defendants in this matter and their counsel on August 31, 2021.  *See* L. Civ. R. 5.2, Section 14(b)(1).

/s/ Alex G. Leone
**Alex G. Leone**
**P.O. Box 1274**
**Maplewood, New Jersey 07040**
**aleone@jd16.law.harvard.edu**
