<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ALEX G. LEONE,<br><br>                    Plaintiff,<br><br>v.<br><br>ESSEX COUNTY PROSECUTOR'S OFFICE, THEODORE STEPHENS II, ROMESH SUKHDEO, GWENDOLYN WILLIAMS, and ROGER IMHOF,<br><br>                    Defendants. | Civil Action No. 21-12786 (SDW) (ESK)<br><br>**OPINION**<br><br>September 23, 2021 |

**WIGENTON**, District Judge.

Before this Court is Plaintiff Alex G. Leone's ("Plaintiff") Motion for a Preliminary Injunction Pending Appeal (the "Renewed Motion"). (D.E. 20.) For the reasons discussed below, the Renewed Motion is **DENIED**.

## I.    <u>FACTUAL BACKGROUND</u>

Plaintiff, an assistant prosecutor in the Financial Crimes and Intellectual Property ("FCI") Unit within the Essex County Prosecutor's Office ("ECPO"), alleges that his employer, alongside various supervisors, including Theodore Sukhdeo, Roger Imhof, and Gwendolyn Williams (collectively, "Defendants"), discriminated against him by denying his accommodation request to work from home indefinitely for religious reasons (the "Request"). (D.E. 1 ("Compl").) Prior to the global COVID-19 pandemic, from September 2019 to March 2020, Plaintiff worked at ECPO

in a fully in-person capacity (the "Traditional Schedule").  (D.E. 11 at 3.)  In March 2020, COVID-19 cases in the United States began to spike.[1]  In response, political and health leaders throughout the country, including many in New Jersey, issued guidance for employers to reduce the spread of the virus and protect employees.  (*See* D.E. 11 at 1.)  Many companies and courts accepted this guidance and began to "operate[] entirely remotely."  (*See id.*)  As deaths rose, state and federal courts postponed trials, paused jury selections, and reduced judicial functions to the bare minimum.[2]

Following this guidance, Defendants reduced their employees' traditional in-person work requirements to a hybrid schedule "A/B Schedule," allowing attorneys to alternate in-person and remote work every other week so that in-person capacity never exceeded 50% (the "Interim Schedule").  (*See* D.E. 11 at 1.)  In Fall 2020, as COVID-19 infections began to rise again, Defendants abandoned the Interim Schedule and allowed all employees to work almost fully remotely, with only occasional trips into the office (the "Remote Schedule").[3]  (*Id.* at 1–2.)  On or around April 5, 2021, as vaccinations became widely available and businesses and courts began to return to normal operations, Defendants chose to shift certain units, including the FCI Unit, back to the Interim Schedule.  (*Id.* at 2, 4; D.E. 8-1 at 2–3; D.E. 11-3, Ex. B ("Imhof Decl."), ¶ 5.)  During this period, a few units, including the Appellate and Trial Units, remained on the Remote Schedule.  (D.E. 11 at 4.)  Defendants' scheduling decisions were partially motivated by stresses on supervisors that were expected to exponentially increase as courts reopened.  (*Id.* at 5.)

---

[1] William Frey, *One Year In, COVID-19's Uneven Spread Across The US continues*, Brookings Institute, Mar. 5, 2021, https://www.brookings.edu/research/one-year-in-covid-19s-uneven-spread-across-the-us-continues/.

[2] *See* D.E. 11-2, Ex. A at 5–6; District Court for the District of New Jersey Standing Order 20-02 (March 16, 2020), https://www.njd.uscourts.gov/sites/njd/files/StandingOrder2.pdf; Supreme Court of New Jersey Standing Order (March 27, 2020), https://www.njcourts.gov/notices/2020/n200327a.pdf?c=tpH.

[3] These scheduling changes placed supervisors under an unsustainable level of stress, as they were required to take on "the responsibilities of assistant prosecutors in dealing with emergent matters."  (*Id.* at 5; Tr. 21:16–17.)

On April 26, 2021, Plaintiff submitted his Request, asking that he "be permitted to work from home for religious reasons" permanently. (*Id*. at 2, 5; D.E. 11-4, Ex. C; D.E. 8-1 at 3.) Plaintiff's religion "requires him to pray, including aloud and spontaneously, throughout each day," preferably in his backyard to access "peace and solitude." (*See* D.E. 11-4, Ex. C; D.E. 11 at 2–3.) Plaintiff also asserted that he could go to the office if "reasonably necessary" or whenever "accommodating [his] religious need would cause undue hardship," without explaining how this determination would be made. (D.E. 11 at 2.) On May 3, 2021, Plaintiff requested a transfer to the Appellate Unit, in part to avoid the Interim Schedule. (D.E. 11-7, Ex. F; D.E. 11 at 8.)

On May 6, 2021, Defendants Imhof, Williams, and Gaccione met with Plaintiff through video conference call. (D.E. 11 at 8.) Plaintiff and Defendants discussed the feasibility of the Request and various proposed accommodations. (*Id*.) Mr. Imhof explained that being in the office assisted new attorneys with their growth and development as trial lawyers, through court observations and collaboration with colleagues on, *inter alia*, investigations, interviews, and case presentations. (D.E. 11 at 5–6; Imhof Decl. ¶¶ 8–11.) Defendants also explained various concerns about indefinite remote work, including the stresses of responding to an anticipated surge of new matters without a fully-staffed office. (D.E. 11-5, Ex. D, May 12, 2021 Imhof Memorandum ("Imhof Memo") at 3.) Plaintiff stated that praying in his office could "occasionally" be an option. (D.E. 11 at 6.) On May 12, 2021, Mr. Imhof summarized the conference, as well as ECPO's positions regarding Plaintiff's Request, in a memorandum.[4] (*Id*. at 6; Imhof Memo.)

Although Defendants did not agree to Plaintiff's permanent work-from-home request, they did offer Plaintiff various accommodations. (D.E. 11 at 2, 6; *see generally* Imhof Memo.) These

---

[4] The memo mentions religious accommodations "in the courtroom," which refer to "a dispute when Plaintiff closed his eyes for spiritual reflection in a courtroom and was asked by the presiding judge to keep his eyes open." (D.E. 11 at 3 n.1.) However, Defendants clarify that this "prior request is not referenced in Plaintiff's Complaint." (*Id*.)

included: praying in his private office; relocating his office to a soundproof interview room; retaining his private office but also gaining exclusive access to a soundproof interview room to use for prayer at his sole discretion; or walking directly across the street from the office to the Eagle Rock Reservation, a 400-acre public park, in order to locate secluded locations in nature in which to pray.  (D.E. 11 at 3.)  Defendants also seem to have considered the option of allowing Plaintiff to drive home when he felt the need to pray.  (*See* Imhof Memo at 2.)

On June 1, 2021, Plaintiff responded with a memorandum rejecting each proposed accommodation.  (D.E. 11 at 8; D.E. 11-6, Ex. E ("Leone Memo").)  Plaintiff pushed Defendants to accept the Request as written but stated that he would be open to revising his accommodation "if necessary in the future."  (Leone Memo at 5.)  On June 9, 2021, Mr. Imhof reiterated ECPO's unchanged position and communicated that there were no open positions in the Appellate Unit.  (D.E. 11-7, Ex. F.)  On July 26, 2021, Defendants announced that all units would return to the Traditional Schedule on August 2, 2021.  (D.E. 11 at 8; D.E. 11-8, Ex. G; *see also* D.E. 11-2, Ex. A at 1.)  Since that date, all units have been on the Traditional Schedule.  (*See* D.E. 11 at 2, 8.)

## II.    PROCEDURAL BACKGROUND

On June 18, 2021, Plaintiff filed his Complaint alleging that Defendants' denial of the Request violated the United States Constitution's Free Exercise Clause and the New Jersey Law Against Discrimination ("NJLAD").  (Compl.)  On July 30, 2021, after Defendants' announcement regarding the return to the Traditional Schedule, Plaintiff filed a Motion for a Preliminary Injunction (the "Original Motion").  (D.E. 8-1.)  Much of Plaintiff's briefing focused on his concerns about the Traditional Schedule.  (*Id*. at 3, 5.)  Defendants opposed the Original Motion

on August 24, 2021, (D.E. 11), and Plaintiff replied on August 31, 2021, (D.E. 13).[5]  This Court heard oral argument on September 7, 2021.  (D.E. 12; D.E. 17; D.E. 23, Sept. 7, 2021 Oral Argument Transcript ("Tr.").)  At the hearing, this Court denied Plaintiff's Original Motion and ordered the case to continue in the normal course.  (Tr. 23:6–29:2; D.E. 18.)  Later that evening, Plaintiff appealed the order denying the Original Motion and filed his Renewed Motion, requesting a preliminary injunction pending appeal.  (D.E. 19; D.E. 20.)  On September 16, 2021, Defendants opposed.  (D.E. 25.)  On September 17, 2021, Plaintiff replied.  (D.E. 26.)

## III.  **LEGAL STANDARD**

A court may "suspend, modify, restore, or grant an injunction during the pendency of [an] appeal."  Fed. R. Civ. P. 62(c).  "[T]he standard for obtaining a stay pending appeal is essentially the same as that for obtaining a preliminary injunction."  *Conestoga Wood Specialities Corp. v. Sec'y of U.S. Dep't of Health & Hum. Servs.*, Civ. No. 13-1144, 2013 WL 1277419, at *1 (3d Cir. Feb. 8, 2013); *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  To obtain the extraordinary remedy of a preliminary injunction before trial, Plaintiff was required to demonstrate that: (1) he had a substantial likelihood of success on the merits, (2) he was likely to suffer irreparable harm in the absence of relief, (3) the balance of equities tipped in his favor, and (4) an injunction was in the public interest.  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *Reilly v. City of Harrisburg*, 858 F.3d 173, 177 (3d Cir. 2017).  Because the "first two factors are the 'most critical,'" they are considered "'gateway factors.'"  *Julius Realty Corp. v. Thompson*, Civ. No. 20-4575, 2020 WL

---

[5] Plaintiff filed a twenty-eight page reply without requesting permission to exceed the maximum page limit.  (D.E. 13.)  The reply was replete with pointed comments aimed at opposing counsel.  (*See, e.g.*, *id.* at 3 n.3, 7, 9 n.10, 10 n.11, 12 n.13, 13, 14 n.14, 16.)  Had Plaintiff reduced these comments, he may have avoided surpassing the page limit.

2539188, at *1 (D.N.J. May 19, 2020) (citations omitted).  "Only if a plaintiff meets the threshold for these gateway factors does the Court consider the remaining factors."  *Id*.

## IV.    DISCUSSION

This Court denied the Original Motion because Plaintiff had failed to establish a likelihood of success on the merits or irreparable harm.  (Tr. 23:6–29:2.)  As Plaintiff's Renewed Motion fails for the same reasons, this Court will expand upon the reasoning already articulated on the record.

### a.   First Amendment Free Exercise Claim

"The Free Exercise Clause of the First Amendment, which has been made applicable to the States by incorporation into the Fourteenth Amendment, provides that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'"  *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 876–77 (1990) (internal citations omitted) (quoting U.S. Const. amend. I).  Under the Free Exercise Clause, the "government may not compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma."  *Id*. at 877 (internal citations omitted).

### i.   Entitlement To Protection

This Court must first determine whether Plaintiff's alleged religious practice is entitled to relief.  "[T]he two prerequisites for finding that a religious practice is entitled to protection are that 'the beliefs avowed are (1) sincerely held, and (2) religious in nature, in the claimant's scheme of things.'"  *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 275 (Nov. 27, 2007) (citing *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000)).  "While courts may not inquire into the verity of a religious belief, 'it is entirely appropriate, indeed necessary, for a court

to engage in analysis of the sincerity of someone's religious beliefs in both the free exercise context, and the Title VII context.'" *Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 137 (3d Cir. 1986) (citations omitted).  As Defendants do not currently dispute whether Plaintiff's beliefs are sincerely held, for the purposes of this opinion, this Court will accept that Plaintiff's beliefs meet both prerequisites.

## ii.  Likelihood Of Success On The Merits

### 1.  Determining the Appropriate Standard of Review

Next, this Court must determine the correct standard of review applicable to the alleged harm.  (*Compare* D.E. 11 at 10 (asserting that rational basis review applies) *with* D.E. 8-1 at 6–8 (arguing that strict scrutiny applies).)  The Supreme Court has repeatedly emphasized "the general proposition" that rational basis review applies to state actions that are neutral and generally applicable, "even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Smith*, 494 U.S. at 872); *see also Chapman v. Pennsylvania Interscholastic Athletic Ass'n*, Civ. No. 14-192, 2014 WL 2770699, at *3 (M.D. Pa. June 18, 2014) (citing *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002)).  A law that "discriminates against religiously motivated conduct" is not neutral.  *Tenafly*, 309 F.3d at 165; *see also Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004).  A law that "proscribes particular conduct only or primarily when religiously motivated" is not generally applicable.  *Tenafly*, 381 F.3d at 165.

Rational basis review applies in this case because both scheduling directives were neutral and generally applicable.[6]  "It is undisputed" that the transition back to the Traditional Schedule required "all ECPO employees, of every unit" to return in-person work.  (D.E. 25 at 4 (emphasis in original); Tr. 24:4–5.)   The scheduling directive did not discriminate against religiously motivated conduct or apply unevenly to individual employees.[7]  The same is true of the transition from the Remote Schedule to the Interim Schedule.  Each of Plaintiff's arguments to the contrary is based on a false premise: that ECPO's schedule changes were not neutral or generally applicable because they somehow favored "secular" activity.[8]  (D.E. 8-1 at 7–8.)   "[W]hat's lost in that assertion is the fact that the relief that was granted," allowing employees to work temporarily from home, was granted to "everyone" in a unit.  (Tr. 23:25–24:9.)  A closer analysis of *Tandon* and *Roman Catholic Diocese*, which are easily distinguishable, helps to illustrate this point.

In both cases, state actors wrote distinct pandemic capacity caps into the text of laws governing non-religious businesses and places of religious gathering.  *Tandon v. Newsom*, 141 S.

---

[6] State action that triggers strict scrutiny "violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest."  *Tenafly*, 309 F.3d at 165.  Even if a higher level of review applied, which it does not, Defendants would still be capable of mounting a strong argument.  Defendants articulated many powerful interests in maintaining in-person work from employees.  *See infra* 7–12.  Defendants' scheduling directives have also repeatedly been tailored to respond to the pandemic without compromising their responsibility to serve the public.  For one example, it was only after the Interim Schedule failed to assuage risks that Defendants moved to the Remote Schedule.  (*See* D.E. 11 at 1–2.)

[7] Plaintiff seems to explicitly acknowledge in his discussion of *Tandon* that the transition back to the Traditional Schedule did not grant any exemptions and was generally applicable.  (*See* D.E. 13 at 5–6.)

[8] The same is true for Plaintiff's citations to *Thomas*, *Sherbert*, and *Hobbie*.  (D.E. 8-1 at 7.)  Plaintiff alters the meaning of *Hobbie* by suggesting that it considers the scope of an employee/employer relationship.  (*Id.*)  Rather, *Hobbie* and its related cases assess the scope of state unemployment benefit programs and interpret employment benefit withholding as a coercive fine inflicted on religious observance where a plaintiff resigned from a job that conflicted with his or her religious beliefs.  *See Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 717 (1981); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963); *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 140–41 (1987).  This line of cases is, at best, tangential to Plaintiff's case.

Plaintiff also misconstrues *Lyng* as supporting the applicability of strict scrutiny in this case.  (D.E. 8-1 at 7); *but see Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450–51 (1988) ("This does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions.").

Ct. 1294, 1297 (2021); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2021). The Supreme Court held that these rules treated "comparable secular activity more favorably than religious exercise," because the non-religious entities were allowed to remain open at a greater capacity than religious entities, such as churches. *Tandon*, 141 S. Ct. at 1296; *see also Roman Cath. Diocese*, 141 S. Ct. at 66, 69 (Gorsuch, J., concurring). Thus, the pandemic capacity directives were poorly tailored and effectively undermined their purported interests in reducing COVID-19 risks. *See*, *e.g.*, *Roman Cath. Diocese*, 141 S. Ct. at 66–67.

In contrast, the Interim Schedule was not designed or applied in a manner that created disparate outcomes between religious and non-religious FCI Unit employees.[9] (*See* Tr. 6:7–10 (acknowledging that the schedules were the "status quo" for employees during the pandemic)); *cf. Fulton v. City of Philadelphia, Pennsylvania*,[10] 141 S. Ct. 1868, 1877 (2021); *Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (finding a rule violative of the Free Exercise Clause where "impermissible value judgments" were made); *Ward*

---

[9] For the same reason, Defendants' decision to pick certain units to return to the office during the Interim Schedule, while keeping others (such as the Trial Unit, which would have seen a decrease in workflow due to pandemic trial delays) remote, did not amount to a system of individualized or unconstitutional exemptions. (*See* D.E. 8-1 at 8.)

[10] Plaintiff repeatedly highlights *Fulton* to support his argument that Defendants' scheduling decisions were not effectuated in a neutral and generally applicable manner. (*See*, *e.g.*, D.E. 8-1 at 7.)

First, *Fulton* has been widely acknowledged as a narrow ruling that avoided directly confronting *Smith*, cobbled together from multiple concurrences. *See*, *e.g.*, Andrew R. Lewis, *The Supreme Court handed conservatives a narrow religious freedom victory in Fulton v. City of Philadelphia*, The Washington Post, June 18, 2021, https://www. washingtonpost.com/politics/2021/06/18/supreme-court-handed-conservatives-narrow-religious-freedom-victory-fulton-v-city-philadelphia/; Nina Totenberg, *Supreme Court Rules Catholic Group Doesn't Have To Consider LGBTQ Foster Parents*, NPR, June 17, 2021, https://www.npr.org/2021/06/17/996670391/supreme-court-rules-for-a-catholic-group-in-a-case-involving-gay-rights-foster-c.

Second, *Fulton* is easily distinguishable. There, the Supreme Court considered Philadelphia's refusal to contract with plaintiff, a religious adoption agency that would not place children with same-sex couples. *Fulton*, 141 S. Ct. at 1877. Plaintiff argued that the city's foster care contract included a "non-discrimination" clause specifically written to bar plaintiff from contracting. *Id.* at 1879. There is no evidence of any comparable motive to target Plaintiff and his religious beliefs in this case, and there is no system of discretionary exceptions. *See also Hashmi v. City of Jersey City*, Civ. No. 19-18884, 2021 WL 4059852, at *5 (D.N.J. Sept. 7, 2021) (distinguishing *Fulton* on the grounds that Philadelphia had "'incorporate[d] a system of individual exemptions, made available . . . at the 'sole discretion' of the Commissioner,' who had no intention of granting an exemption to [plaintiff]").

*v. Polite*,[11] 667 F.3d 727, 739–40 (6th Cir. 2012) (citing *Kissinger v. Board of Trustees of Ohio State University*, 5 F.3d 177 (6th Cir. 1993) (rejecting a free-exercise challenge where the plaintiff, a student who took issue with a specific course, "could not identify any circumstances in which" exceptions to the required course had been made)).  At an even more basic level, *Tandon* and *Roman Catholic Diocese* considered the impact of pandemic capacity directives on specific secular and religious activities.  Here, Plaintiff seems to conflate the pandemic scheduling directive with the secular activity, suggesting that working from home is itself secular.  This is an analogical fallacy.[12]

The Third Circuit's decision in *Fraternal Order* is not only not to the contrary, but in fact supports denying Plaintiff's requested relief.  (D.E. 8-1 at 10–12.)  In *Fraternal Order*, the Newark Police Department had endorsed an official policy of allowing medical exceptions to its "no-beards" regulation but refused to make religious exceptions to allow Muslim police officers to grow facial hair.  *Fraternal Order*, 170 F.3d at 360–61.  Describing its own opinion, the Third Circuit noted that the "focus" of *Fraternal Order* was Newark's "lack of neutrality in applying the no-beards regulation."  *Webb v. City of Philadelphia*, 562 F.3d 256, 262 (3d Cir. 2009).  The Third Circuit distinguished *Fraternal Order* in *Webb*, which is instructive here.  *See id*.

---

[11] Plaintiff's reliance on the out-of-circuit case *Ward v. Polite* is also misguided.  667 F.3d 727, 739–40 (6th Cir. 2012).  The *Ward* court reversed the trial court because it found questions of fact better suited for a jury, such as the fact that a code applicable to the relevant program allowed individuals to make values-based determinations.  *Id*.  Although it may be true that "[a]t some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions," Plaintiff has not identified any such evidence in this case.  *Id*. at 740.

[12] Plaintiff had repeatedly advised this Court to "look at the cases" on which he relies.  (*See*, *e.g.*, D.E. 26 at 3; *Alex Leone v. Essex County Prosecutors Office*, Appellate Docket No. 21-2684, ECF No. 3 at 9–10 (asserting that this Court was unaware of "applicable Supreme Court precedents").)  To be clear, the cases cited by Plaintiff are unpersuasive because they are factually dissimilar.  For example, Plaintiff repeatedly equates the scheduling directives to fact patterns dealing with facial and textual discussions of religion.  *See*, *e.g.*, *Church of the Lukumi*, 508 U.S. at 521 (applying strict scrutiny where the "ordinances' texts and operation demonstrate[d] that they [we]re not neutral, but have as their object the suppression of Santeria's central element, animal sacrifice"); *Roman Cath. Diocese*, 141 S. Ct. at 66 (applying strict scrutiny to a statute that referenced religious distinctions on its face and "single[d] out houses of worship for especially harsh treatment"); *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (applying strict scrutiny where "California's Blueprint System contains myriad exceptions and accommodations for comparable activities"); (D.E. 25 at 4–7; Tr. 14:18–21.)

In *Webb*, a Muslim police officer asked for permission to wear a hijab, but the Philadelphia Police Department denied her request, citing a uniform memorandum that did not authorize religious garb.  *Id*. at 258.  The officer filed suit alleging religious discrimination and the District Court granted summary judgment for defendant.  *Id*.  On appeal, the Third Circuit affirmed, explaining that, unlike Newark's medical exception governing beards, Philadelphia's rule governing officer uniforms "contain[ed] no exceptions, nor is there evidence the City allows other officers to deviate from it."  *Webb*, 562 F.3d at 262.  Here, Plaintiff has failed to present examples of individualized or categorical exceptions within specific units.[13]  (*See* D.E. 8-1 at 7–8.)  Thus, the current record suggests that the scheduling directives were neutral and generally applicable. As a result, rational basis review applies.  *See Bowen v. Roy*, 476 U.S. 693, 707–08 (1986).

## 2.  Applying Rational Basis Review

Under rational basis review, Defendants meet their burden when they "demonstrate[] that a challenged requirement" is "a reasonable means of promoting a legitimate public interest."  *Id*.; *Church of the Lukumi*, 508 U.S. at 531 (1993) (rational basis does not require a compelling governmental interest).  "[T]he challenged classification must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Donatelli v. Mitchell*, 2 F.3d 508, 513 (3d Cir. 1993) (internal citations and quotations omitted).

Defendants have clearly exceeded this bar by articulating a myriad of reasons for their denial of Plaintiff's Request.  These include, but are not limited to: running a "critical law enforcement agency in one of the . . . busiest counties in the state," responding to the demands of

---

[13] Although Plaintiff asserts "on information and belief" that prosecutors have been allowed to work from home occasionally, he has not provided any specific examples, and simultaneously acknowledges that the "main reason" for the staff-wide scheduling changes was the "pandemic."  (*See* Tr. 15–18, 26:10–16 (this Court discussing Plaintiff's vague allegations); D.E. 8-1 at 8); *Webb*, 562 F.3d at 262 (finding vague assertions regarding potential exceptions insufficient to create an issue of material fact, as "neither officer presented any evidence of 'who' or 'when,' nor did either know whether the police department authorized or was even aware of the alleged occurrences.").

reopening courts and resuming criminal trials, managing an increasing "influx of complaints and investigations," fostering "[c]ollaboration and observation of colleagues" for junior prosecutors, ensuring that attorneys "gain experience and guidance" from more experienced colleagues, and ensuring that supervisors are not overburdened. [14, 15] (*See* D.E. 25 at 7; D.E. 11 at 10–11.) A functional and efficient prosecutorial office also indirectly impacts the safety of police officers and communities, which the Third Circuit has highlighted as an important state interest. *Webb*, 562 F.3d at 262. Defendants also have an interest in decreasing the rate of virus spread within the state justice system, particularly as criminal attorneys are likely to be in contact with inmates.[16] *See Roman Cath. Diocese*, 141 S. Ct. at 67. Given these justifications, this Court cannot conclude that Plaintiff is likely to succeed on his claim that "Defendants categorically discriminate against religious exemptions."[17] (D.E. 8-1 at 8.)

In response, Plaintiff argues that the accommodations undermine Defendants' alleged interests in maintaining the Traditional Schedule because they grant him the flexibility to leave his desk for prayer. (D.E. 8-1 at 13.) This argument disregards Defendants' core goal: ensuring that Plaintiff's baseline location during business hours is ECPO's office. (*See* Tr. 21:7–15.) Plaintiff's arguments related to his work-from-home efficiency fail for the same reason. (*See, e.g.*, D.E. 13

---

[14] Plaintiff repeatedly insists that future concerns cannot contribute to ECPO's scheduling choices but cites no authority to support this point. (*See* D.E. 8-1 at 12 n.6.)

[15] Plaintiff's argument, in reliance on *Fulton*, that these interests were not articulated with sufficient "specificity" is specious. (*See, e.g.*, Tr. 10:2–9); *see also Hashmi*, 2021 WL 4059852 at *5 (acknowledging, post-*Fulton*, defendant's interests in maintaining a non-religious uniform policy and noting that "shared sacrifice fosters collegiality and camaraderie" among colleagues, which "aid[s] them in effectively working together").

[16] *See N.J. prison with worst COVID-19 outbreak in the country set to get vaccine next week*, NJ.com, Jan. 13, 2021, https://www.nj.com/news/2021/01/nj-prison-with-worst-covid-19-outbreak-in-the-country-set-to-get-vaccine-next-week.html; (D.E. 11 at 10–11.)

[17] Plaintiff repeatedly mischaracterizes the Imhof Memo as "categorically asserting that religion can *never* justify working from home *at all* 'presently or in the future.'" (D.E. 13 at 7 (emphasis in original), 22; D.E. 26 at 2; Tr. 6:16–25); *see also Alex Leone*, Appellate Docket No. 21-2684, ECF No. 3 at 6. In reality, the Imhof Memo denied Plaintiff's request to "work from home *on a full-time basis*." (Compl., Ex. D at 2 (emphasis added).) It did not state that "religion" could never justify working from home "at all." (*See also* D.E. 25 at 9.)

at 12 n.13, 18, 19, 23.)  This is particularly true given the fact that Plaintiff's supervisors have significantly more experience than Plaintiff in assessing ECPO's staffing needs.[18]

As noted previously, the Original Motion failed to establish a likelihood of success on the Free Exercise claim.  Because the Renewed Motion has not presented any evidence that would change that conclusion, it fails to establish a likelihood of success on appeal.

### iii.   <u>Irreparable Harm</u>[19]

"In general, to show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial."  *State Trooper Fraternal Ass'n v. New Jersey*, Civ. No. 08-3820, 2008 WL 4378343, at *4 (D.N.J. Sept. 23, 2008).  "[T]he Supreme Court has, for a long time now, made clear that a free speech violation in and of itself counts as irreparable harm."  *Reyes v. Bayne*, Civ. No. 21-00334, 2021 WL 2533466, at *10 (E.D. Ark. June 21, 2021).  "Recently," the Supreme Court "broadened that principle to at least one other part of the First Amendment," *id*., and found "irreparable harm in a Free Exercise Clause case," *id*. at *10 n.118 (citing *Roman Cath. Diocese*, 141 S. Ct. at 67); (Tr. 26:17–21).

Plaintiff's Request described his religious practice as a need to pray aloud, spontaneously, and, preferably, in nature.  (Tr. 13:11–14 (stating that he needs to be able to "perceiv[e] and contemplat[e] the handiwork of the Creator, such as by looking up at the sky"), 24:22–25:14.)  In response, Defendants offered Plaintiff various accommodations that "would have enabled

---

[18] Similarly, Plaintiff argues that, because he has never experienced an emergent matter during his employment with ECPO, emergent matters rarely, if ever, occur.  (D.E. 13 at 14.)  The record demonstrates that Plaintiff was employed by ECPO for less than six months before the onset of the global pandemic, suggesting that supervisors such as Mr. Imhof may be better suited to assess the commonality of emergent matters.

[19] Plaintiff mistakenly asserts that Defendants have conceded irreparable harm.  (D.E. 13 at 9, 13.)  This Court sees no evidence of this in Defendants' briefing.

[Plaintiff] to freely exercise his religion while maintaining his current job."[20]  *Horvath v. City of Leander*, 946 F.3d 787, 793–94 (5th Cir. 2020), *as revised* (Jan. 13, 2020).  Defendants also articulated hardships that it would suffer if forced to comply with Plaintiff's Request as written.  *See also Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 67 (1977) (employer's attempts to accommodate religious need for days off were sufficient without violating the seniority rights of other employees or absorbing more than a *de minimus* loss).  Plaintiff refused to meaningfully engage in any type of compromise, (*see generally* Leone Memo), before filing suit based solely on his own testimony that he has been "forced to forgo a prayer practice" by not being able to work from home, (D.E. 26 at 1; Tr. 8:5–8).  At this premature stage of litigation, this Court agrees that it is not "remotely a foregone conclusion that Plaintiff must forego prayer when he is in the office." (D.E. 11 at 13–14); *see also Lyng*, 485 U.S. at 452 ("[G]overnment simply could not operate if it were required to satisfy every citizen's religious needs and desires").  As a result, Plaintiff's current use of accumulated leave in order to remain working from home is insufficient to meet this prong.

As for Plaintiff's alleged psychological and physical harms, (D.E. 8-1 at 12 n.6, 16), these are at cross purposes with his asserted ability to come to the office whenever he deems necessary, (D.E. 11 at 14; D.E. 25 at 10; Tr. 19:25–20:7).  Plaintiff has not offered any convincing clarification on this point.  Finally, Plaintiff's requested relief is a moving target.  Plaintiff originally requested the ability to come to work whenever he found it reasonably necessary, but now requests a return to the Interim Schedule.  (*Compare* D.E. 8-5 *with* D.E. 20-2.)  Thus, given

---

[20] Plaintiff's insistence that he may only find the "solitude" and "peace" required for him to pray in his own backyard, while dismissing his employer's proposed compromise that, for example, Plaintiff pray in a nearby large public park, is particularly noteworthy.  Plaintiff asserts that there is a meaningful difference in the "spontaneity" of walking into his own backyard, versus walking into the park across the street from his office.  (D.E. 13 at 24.)  "While we do not question that the act of assembling for prayer or worship is religious in nature, we do not assume" that a "particular property . . . has any religious significance."  *See Lighthouse Inst.*, 510 F.3d at 275 (discussing free exercise in the context of church zoning).

the proffered accommodations, the undeveloped record, and the contradictions in alleged harm, irreparable harm has not been established.[21]

### iv.   Balancing of Equities and the Public Interest

As Plaintiff has failed to meet the first two prongs, this Court need not consider the final factors.  (*See* Tr. 15:5–10, 23:10–24); *see Beberman v. United States Department of State*, 675 Fed. App'x. 131, 135 (3d. Cir. 2017).  For the sake of completeness, however, this Court considers the final two factors together.  Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Oburn v. Shapp*, 521 F.2d 142, 152 (3d Cir. 1975).  "Generally, neither the government nor the public itself can claim an interest in enforcing an unconstitutional governmental action."  *See*, *e.g.*, *LCN Enterprises, Inc. v. City of Asbury Park*, 197 F. Supp. 2d 141, 153 (D.N.J. Mar. 14, 2002) (citation omitted).  Nonetheless, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (citation omitted).

The potential harms of an inefficient or malfunctioning prosecutor's office weigh against granting the Renewed Motion.  Plaintiff has never articulated a limit to his Request for "unilateral and subjective authority to determine when he would appear for work," (D.E. 11 at 3), beyond stating that he would take pains not to cause undue hardship, (D.E. 13 at 17).  This discretion creates myriad potential harms to Defendants, who run the "busiest law enforcement and prosecutorial county agency in the State."  (*See* D.E. 11 at 4–5, 18, 20); *see supra* 11–12.  These harms bleed into potential public consequences, diverting limited public funding to employ an

---

[21] Even if Plaintiff had clearly established harm, which he has not, given the weaknesses discussed above regarding likelihood of success on the merits, *see supra* 7–12, and the balancing of the harms discussed below, *see infra* 14–16, a preliminary injunction would not be warranted.

individual who is unable to fully contribute through physical presence in the office.  (*See id.*; D.E. 25 at 12.)  Alongside Plaintiff's failure to demonstrate more than a speculative injury, these risks make it inappropriate for this Court to commandeer ECPO's scheduling control.  In conclusion, balancing the equitable factors, Plaintiff has not demonstrated that an injunction is warranted.

### b.  NJLAD

The Original Motion seemed to move solely based on the Free Exercise claim.  (*See generally* D.E. 8-1.)  Nonetheless, for the sake of completeness, this Court notes that Plaintiff has also failed to establish a likelihood of success on his NJLAD claim.  The NJLAD prohibits employers from imposing conditions that "would require a person to violate or forego a sincerely held religious practice or observance" unless, "after engaging in *bona fide* effort, the employer demonstrates that it is unable to reasonably accommodate the employee's religious observance or practice without undue hardship on the conduct of the employer's business."  N.J.S.A. 10:5-12(q)(1).  Here, Defendants made a *bona fide* effort to meet with Plaintiff and brainstorm accommodations that could assist him in finding the solitude he required for prayer.[22]  (*See* D.E. 11 at 12–13; D.E. 25 at 8.)  For the foregoing reasons, Plaintiff has failed to present a likelihood of success on the merits of his NJLAD claim and has failed to establish irreparable harm.

### I.  CONCLUSION

For the reasons set forth above, Plaintiff's Motion for a Preliminary Injunction Pending Appeal, (D.E. 20), is **DENIED**.  An appropriate order follows.

---

[22] Plaintiff also misconstrues Defendants' undue burden arguments.  (*Compare* D.E. 13 at 4 *with* D.E. 11 at 13.) Defendants do not suggest that this Court "need not address" a burdening of Plaintiff's free exercise. (D.E. 11 at 13.) Rather, Defendants argue that because the Imhof Memo offered an accommodation that would allow Plaintiff to pray spontaneously, in solitude, outside, Plaintiff was not actually required to "violate or forego" his sincerely held religious practice," N.J.S.A. 10:5–12(q)(1), and, as a result, Plaintiff's rights were not actually burdened, (*see* D.E. 11 at 13).

_s/ Susan D. Wigenton_
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:       Clerk
cc:        Parties